PLOTKIN, Judge.
Defendants State of Louisiana, Department of Health and Human Resources, and City of New Orleans appeal a trial court judgment finding them both liable for injuries suffered by plaintiff Albertine Arthur when she fell in front of the Tulane Avenue entrance to Charity Hospital on January 27, 1986. We affirm the portion of the trial court’s decision holding the State liable and reverse the portion holding the City liable.
FACTS
Ms. Arthur, who was 80 years old at the time of the accident, fell on the sidewalk as she was leaving the hospital after visiting a sick relative. As a result of the accident, Ms. Arthur suffered a fracture of two bones in her left ankle, for which she underwent surgery the next day. The surgery involved the placement of a plate and six screws to repair the broken bones. Ms. Arthur was hospitalized for nine days and left the hospital wearing a short leg cast; she had to use a walker to help her get around.
Ms. Arthur filed suit against both the State of Louisiana, Department of Health and Human Resources, which owns Charity Hospital, and the City of New Orleans, which owns the sidewalk in front of the hospital. The trial judge found the two defendants solidarily liable; Both have appealed.
STATE’S LIABILITY
In holding the State liable for the plaintiff’s injury, the trial judge stated in his reasons for judgment as follows:
[T]he evidence points clearly to the fact that the plaintiff fell on “broken pieces of concrete” which said concrete was debris on the sidewalk, emanating from construction work for the use and benefit of Charity Hospital of New Orleans, a state agency. More than one witness, including those of Charity Hospital, acknowledged that if there was debris in the area, the responsibility for removing the debris was that of Charity Hospital.
This finding is amply supported by the record in this case. Ms. Arthur’s daughter, Shirley Fazande, who accompanied her mother at the time of the accident, described the area as follows:
Q. Let's talk about the fall for a minute. Did you see your mother fall?
A. She went, when I felt her butt against me, because I was looking waving to my son, she went down and, you know, on her back. She was on her back.
Q. Could you describe the area where she fell?
A. Well there was a lot of, look like construction going on or something. It was a lot of debris all around, you know.
Q. By debris what type?
A. Broken up cement. You know, rocks, look like, you know, big piece of cement, small pieces, you know, it just was a lot of look like shattered concrete or something.
Q. How large of the area that was shattered, broken up, to use your words from what you know.
A. I mean I didn’t just stand and observe all over but from what we could see, no, it was a great area of it.
THE COURT:
Well—
THE WITNESS:
A. Like all in front of the hospital. That front entrance.
THE COURT:
The front entrance to the hospital was torn up?
THE WITNESS:
A. Yes, Sir.
THE COURT:
And you saw that?
THE WITNESS:
*637 A. Yes I did.
BY MR. MORIAL:
Q. And the area where your mother fell was in this broken up area?
A. Yes it was.
Trial transcript, Vol. I, pp. 26-28. Later in the trial, Ms. Fazande testified as follows:
Q. When you look down was your mother’s feet or was she lying on concrete or broken concrete?
A. She was lying on broken concrete.
Q. How much of her body was covered by the broken concrete?
A. Covered.
Q. Was just her foot on top of it?
A. She was down on her back and her leg was under her. There was a lot of broken concrete underneath.
Q. When you say broken concrete do you mean pieces of concrete treat [sic] situated on top of the sidewalk or just concrete broken?
A. Just broken up pieces on the sidewalk, and, you know, it was broken up.
Q. Did it look as if someone was doing some work there to you?
A. It could have been, could have been some construction going on there.
Q. As you were walking toward the sidewalk could you see the broken up concrete at all?
A. Yes, you could see it.
Q. Why did you all continue to walk in that direction?
A. I mean I don’t care how you would go you would have to pass in between it.
Q. You’re aware of it as you were walking is that?
A. Well, yes.
Q. And were you kind of dodging some of it?
A. Yes.
Trial transcript, Vol. I, pp. 81-82. Ms. Arthur testified that she “stumbled and fell over those rocks, concrete,” “some concrete, broken up concrete.” She stated specifically that she did not fall on a crack in the sidewalk.
Raymond Brown, who worked for Charity Hospital as a landscaper, witnessed the accident. He stated that Ms. Arthur fell in an area where the “pavement was sort of like cracked up and damaged in certain areas where she fell.” He testified that construction was going on, “not directly by the spot but ... there was some construction being done on the drain and they was tearing up the ground right up in that area.” He said the “ground” was “made of concrete” and that men were breaking it up with an air hammer. The area where the construction was going on was roped off, Brown said, but the workers were piling the concrete up to the side in a big pile some three feet from the construction area.
On appeal, the State claims that the evidence presented by the plaintiff was insufficient to support the trial court’s decision that the State is liable for the plaintiff’s injuries. The State claims that the evidence establishes that Ms. Arthur fell on cracks on the sidewalk, an area exclusively within the jurisdiction of the City of New Orleans. We disagree. The evidence is clearly sufficient to support the trial court’s judgment. Because the record reveals that the trial court’s judgment on this issue was not manifestly erroneous, that portion of the judgment holding the State liable for the plaintiff’s injuries is affirmed.
CITY’S LIABILITY
The trial judge justified his decision to hold the City liable by stating in his reasons for judgment as follows:
[T]he evidence indicates that there was a substantial crack in the sidewalk where Mrs. Albertine Arthur fell. The evidence further shows that this crack was of sufficient size to indicate that it was present for a long, long time, thus the Court concludes that the City of New Orleans knew or should have known that someone might be injured by the presence of this hazard.
(Emphasis in original.) Nowhere in his reasons for judgment does the trial judge find that the crack, even if it existed, caused Ms. Arthur’s fall. Our review of the record convinces us that the plaintiff failed to prove that a crack in the sidewalk at the location of the accident caused her to fall.
*638 At trial, the plaintiff presented the expert testimony of Michael Dixon, a consulting engineer, civil engineer, and construction manager, who testified concerning the presence of a ⅝ inch crack in the sidewalk at the location where Ms. Arthur fell, running from the hospital itself to the place where new concrete had been poured to make a handicap access ramp. Mr. Dixon stated that this crack was very large and that it had probably been present at the location ever since the sidewalk had been poured, since the 1940’s, although it had probably gotten bigger through the years.
The plaintiff and the State claim that Mr. Dixon’s testimony, when considered in light of other evidence presented in the case, is sufficient to prove that Ms. Arthur’s fall was caused by a crack in the sidewalk, which is owned by the City. However, we reject that argument for several reasons.
First, none of the eyewitnesses stated that the plaintiff fell because of a crack in the City’s sidewalk. The testimony of the plaintiff and of the two eyewitnesses to the accident is detailed in the above section. That testimony, when considered as a whole, indicates that broken pieces of concrete, which were either stacked or dropped on the sidewalk, caused Ms. Arthur to fall. None of the eyewitnesses refer to a crack in the sidewalk as a condition which caused the fall. Neither the plaintiff nor her daughter even mention a crack without prompting from one of the attorneys; even then, the testimony indicates that the fall was not caused by a crack. When questioned by the City’s attorney concerning whether her mother’s foot went into a crack, Ms. Fazande specifically answered, “I don’t know.” Ms. Arthur stated specifically that she fell on broken pieces of concrete, “not a crack,” in answer to a question from the City’s attorney.
Mr. Brown does mention a “split with a big crack in it, a hole like it was crack with a hole,” during his testimony, but that statement seems to be referring to the construction hole he discussed earlier in his testimony, rather than to the ⅝ inch crack identified by Mr. Dixon. When Mr. Brown was called to testify a second time, he said the fall occurred where there was “broken concrete but it was a split in the sidewalk, broken concrete,” saying there is “not much a difference” in the two things. The City’s attorney attempted to pursue this line of questioning, but Mr. Brown continued to insist that there was a “crack” and that there were broken pieces of concrete. The City’s attorney even used Mr. Brown’s deposition in trying to settle this question, but ultimately Mr. Brown’s testimony on this subject was vague; it was not sufficient to establish that the plaintiff fell on the crack in the sidewalk identified by the plaintiff’s expert witness.
Second, even assuming that the plaintiff established the presence of a ⅝ inch crack in the sidewalk in front of Charity Hospital, such a crack does not create an unreasonably dangerous condition, especially in a city where many of the sidewalks contain cracks with drops of six to eight inches. Cracks in sidewalks are common in all urban areas; citizens are not entitled to assume that the sidewalks are perfect. Despite Mr. Dixon’s testimony that the crack at issue here was “very large,” the photographs presented at trial indicate otherwise. The crack is identified in only one of those photographs and it is very difficult to locate. The presence of that crack did not create an unreasonably dangerous condition.
Third, the plaintiff presented no proof that the City received actual or constructive notice of a dangerous condition in its sidewalk in the area in front of the Tulane Avenue entrance to Charity Hospital, as required before the City can be held liable for a dangerous condition by LSA-R.S. 9:2800(B). Ellis Gusler, City Street Department employee, stated that his office had not received any complaints about that area on or before January 27, 1986. The plaintiff attempted to establish constructive notice on the basis of Mr. Dixon’s testimony that the crack had been in existence since the 1940’s. However, in view of our finding that the crack in question did not create a hazardous condition, Mr. Dixon’s testimony is insufficient to establish constructive notice.
*639 Because the record in the instant case contains insufficient evidence to prove that a crack in the City’s sidewalk caused the plaintiff’s fall, the trial court judgment holding the City liable for Ms. Arthur’s injuries is manifestly erroneous. Accordingly, it is hereby reversed.
DAMAGES
The trial judge set the plaintiff’s damages at $65,500; the reasons for judgment do not itemize damages. Ms. Arthur was treated at Charity Hospital immediately after the injury and during her initial recovery. The record contains the testimony of Dr. James Butler, who treated Ms. Arthur at a later date, but contains no information about medical expenses related to Dr. Butler’s treatment. In fact, the record contains no evidence of medical expenses whatsoever. Therefore, we will assume that the entire $65,500 award represents general damages.
The record reveals that prior to the accident, Ms. Arthur suffered from insulin-dependent diabetes, as well as poor circulation and high blood pressure. Because of the fall in front of Charity Hospital, she suffered fractures to two bones in her left ankle, for which she underwent surgery under general anesthesia. During the surgery, a plate and six screws were placed in her ankle. She was hospitalized for nine days. After the surgery, she wore a short leg cast and was forced to use a walker for more than a month. On May 5, 1986, Dr. Phillip Farris, an orthopedic surgeon at Charity, found that the plaintiff had a “well healed fracture” with an “adequate” range of motion; that the plaintiff was neurovascularly intact, and that she was “ambulating without difficulty.” She was discharged by another doctor on October 6, 1978. Dr. Farris stated that the chances were more probable than not that Ms. Arthur would develop post-traumatic osteoarthritis in the ankle because it is a major weight-bearing joint.
The plaintiff and her daughter testified that the plaintiff’s activities were severely curtailed after the accident. Ms. Fazande stated that her mother was very active prior to the injury, but that she could no longer “take care of her business” after the accident. Specifically, Ms. Fazande said her mother was unable to do her own grocery shopping and that she was unable to continue performing her extensive duties as “mother of her church.” Ms. Fazande also stated that her mother stopped driving at some point after the injury, after she had an accident, but the testimony is unclear concerning whether the accident was caused by the injury. At trial, Ms. Fa-zande said that her mother had been confined to a wheelchair since November of 1989. Generally, Ms. Fazande said that her mother had no problems with her foot before the accident, but that she had constant problems since the accident; Ms. Fa-zande said that her mother complains of pain in her ankle every day. Ms. Arthur testified that she is unable to do most of her housework since the accident, and that she no longer does any yardwork as she did prior to the injury.
Dr. Butler testified that Ms. Arthur consulted him about pain and stiffness in her ankle on December 12, 1988. Additionally, Ms. Arthur complained of severe episodes of drainage from an incision in the ankle. Dr. Butler recommended that Ms. Arthur undergo outpatient surgery under a local anesthetic for removal of one of the screws, which he believed caused the drainage, but Ms. Arthur had refused to consider the proposed surgery. Dr. Butler diagnosed Ms. Arthur as suffering from ankyl-osis, or stiffness of the ankle, which caused the loss of approximately 25 percent of the normal motion. He said that if Ms. Arthur did not have the surgery to remove the irritating screw, she would continue to experience drainage periodically. The ankyl-osis is also a permanent problem, Dr. Butler stated.
La.C.C. art. 2324.1 places great discretion with the trial judge in the assessment of damages. Our review of the record and of the jurisprudence regarding injuries similar to those suffered by the plaintiff in the instant case convinces us that the trial judge did not abuse his great discretion in setting Ms. Arthur’s damages at $65,500. Both Jackson v. Tyson, 526 So.2d 398 (La. *640 App. 4th Cir.1988) and Miller v. Great Atlantic & Pacific Tea Co., 510 So.2d 695 (La.App. 1st Cir.) writ denied 513 So.2d 1213 (La.1987) involved ankle injuries which required surgery, in which the plaintiffs were awarded $50,000 in general damages. The damages suffered by the plaintiff in Jackson were remarkably similar to those suffered by Ms. Arthur, as that plaintiff underwent surgery for insertion of a metal plate and a pin, and was hospitalized for nine days, then forced to wear a cast and to use a walker for several months, resulting in a severe curtailment of her activities. The award in this case is not so much greater than those in Jackson and Miller as to constitute an abuse of discretion. Accordingly, the damage award is affirmed.
CONCLUSION
For the above and foregoing reasons, the portion of the trial court judgment holding the City of New Orleans liable for the plaintiffs injuries is reversed. In all other respects, the judgment is affirmed.
REVERSED IN PART AFFIRMED IN PART.