731 So.2d 893 (1998)
Lyannie BELL, Individually and on Behalf of Her Minor Child, April Lynn Bell
v.
Frank AYIO and the West Baton Rouge Parish School Board.
No. 97 CA 0534.
Court of Appeal of Louisiana, First Circuit.
November 13, 1998.
Writ Denied February 5, 1999.
*895 Richard Creed, Jr., Kevin P. Landreneau, Baton Rouge, Counsel for Defendants/Appellants, Frank Ayio and the West Baton Rouge Parish School Board.
Charles A. O'Brien, Baton Rouge, A.M. "Tony" Clayton, Port Allen, Counsel for Plaintiffs/Appellees, Lyannie Bell, Individually and on behalf of her minor child, April Lynn Bell.
Before: LeBLANC, GONZALES, FOGG, PARRO and GUIDRY, JJ.
GONZALES, J.
On October 9, 1992, April Bell, a student at Port Allen Middle School, was being transported on a school bus driven by Mr. Frank Ayio[1] when another student from her school, Fatonya Richard, threatened to beat her up. April informed Mr. Ayio of the threats against her, and at the next stop, Cohn Elementary School, Mr. Ayio put both April and Fatonya off the bus and advised a teacher there to go and get the principal. Then Mr. Ayio reboarded the bus for a few minutes in order to move it out of the way and let the other buses load up. While Mr. Ayio was moving the bus, Fatonya attacked April, kicking and stomping on her ankle. April suffered a broken ankle which required surgical insertion of three screws.
Lyannie Bell, as tutrix of her natural child, April, filed suit on January 27, 1993, against Mr. Ayio, a school bus driver for West Baton Rouge Parish School Board, and against the West Baton Rouge Parish School Board. Fatonya was not a party to the suit. After trial on the merits, the trial court ruled in favor of Lyannie Bell, individually and as tutrix of April Bell, and against Mr. Ayio and the West Baton Rouge Parish School Board, in solido, awarding a total judgment of $193,400. The defendants are appealing that judgment and make the following assignments of error:
1. The trial court erred in applying the "common carrier" standard of negligence.
2. The trial court erred in imposing the burden of proof on defendants to prove that they were not guilty of the slightest negligence.
3. The trial court erred in finding the plaintiffs met their burden of proving inadequate supervision.

*896 4. The trial court's damage award was grossly excessive.

THE REASONS FOR JUDGMENT
We first note that the trial court judgment states that:
At the close of evidence, the Court directed the parties to each prepare proposed Findings of Fact and Reasons for Judgment, and the matter was taken under advisement.
The Court having heard and assessed the testimony of the witnesses, documentary evidence presented, and adopting plaintiff's proposed Findings of Fact and Reasons for Judgment....
As this court stated in Miller v. Smith, 391 So.2d 1263, 1265 (La.App. 1st Cir.1980), writ granted, 396 So.2d 919 (La.1981), affirmed on other grounds, 402 So.2d 688 (La.1981):
When a trial judge has provided no reasons for judgment, a reviewing court must divine them. When reasons are provided, a reviewing court must be assured that the thinking process was that of the judge and not an advocate in the lawsuit. It is one thing for victorious counsel to prepare a judgment comprised of the stark, final determinations of a case. It is quite another for a counsel to present as the inner thoughts of a judge what amounts to a well-written brief.
In the present case, the reasons for judgment are counsel's, not the judge's. Counsel, in brief, repeatedly cites his own written reasons, a highly self-serving act. Contrary to our general practice, we cannot place any real value on the written reasons presented.
And in State, Dept. of Transp. and Dev. v. August Christina & Brothers, Inc., 97-244 (La.App. 5th Cir.2/11/98), 716 So.2d 372, 375, 1998 WL 63834, *3, the court stated: "We believe that the better course by far is for a trial judge to author any reasons for judgment himself, thereby giving us the benefits of his thoughts and his insights into the litigation under consideration." In that case the Fifth Circuit found that the reasons for judgment which were drafted by the attorneys for the defendant were not supported by the evidence, and they were thus viewed by the court with a "jaundiced eye."
As pointed out by this court in Miller, this court cannot place any real value on the written reasons presented when they are drafted in their entirety by counsel for one of the parties. However, because there is some evidence supporting these reasons, we do not reject them totally. See State, Dept. of Trans. and Dev. v. August Christina & Brothers, Inc., at 375, 1998 WL 63834, *3.

THE TRIAL COURT'S FAILURE TO QUANTIFY THE FAULT OF FATONYA
Louisiana Civil Code article 2323 provides:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.

*897 C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.
This wording of the Civil Code article was the result of a 1996 amendment. 1996 La. 1st Ex.Sess., Acts. No. 3, § 1. The Louisiana Supreme Court, in Keith v. United States Fidelity & Guaranty Company, 96-2075 (La.5/9/97), 694 So.2d 180, 182-183, stated:
Comparing La.Civ.Code art. 2323, as amended, to its predecessor, it is apparent that the basic structure for comparative fault is unchanged. However, we observe that the Legislature added more specific language to Art. 2323 making it mandatory for the determination of the percentage of fault of all persons contributing to an injury, whether those persons are unidentified non-parties, statutorily immune employers, or others.
* * * * * *
After carefully considering Act 3, we find that the legislative amendment of La.Civ.Code art. 2323 was procedural legislation. Act 431 of 1979 amended and reenacted La.Civ.Code arts. 2103, 2323, and 2324 to usher a comparative fault system into Louisiana. This act eliminated the doctrine of contributory negligence and provided the framework for a comprehensive scheme of loss apportionment in multi-party litigation. Since the adoption of a pure comparative fault system, it has been the task of the factfinder to allocate shares of negligence.
Keith, 694 So.2d at 182-83 (Citations omitted.)
Following the dictates of Keith, as we are constrained to do, it was legal error for the trial court to fail to quantify the fault of Fatonya, who was not a party to this case, but nonetheless was clearly at fault for stomping on April's ankle and causing her injuries.
Where the trial court commits legal error by applying an incorrect legal standard, this court is required to determine the facts de novo from the entire record and render a decision on the merits. Noveh v. Broadway, Inc., 95-2081 (La.App. 1st Cir.5/10/96), 673 So.2d 349, 353, writ denied, 96-1431 (La.9/13/96), 679 So.2d 109; Gentile v. Baton Rouge General Medical Center, 95-0348 (La.App. 1st Cir.11/9/95), 665 So.2d 422, 431. Therefore, based on the legal error made by the trial court, we review the liability issue in this case de novo.

THE COMMON CARRIER DOCTRINE
The written reasons for judgment adopted by the trial court state:
12. The law of Louisiana is that a school bus is a "common carrier". As such, the school bus driver must exercise "the highest degree of care" for school children whose safety is entrusted to him. Robertson v. Travis, 393 So.2d 304 (La.App. 1st Cir.1980), writ denied, 397 So.2d 805; Bruno v. Fontan, 338 So.2d 715[713] (La.App. 4th Cir.1976); Landry v. Travelers Indemnity Company, 155 So.2d 102 (La.App. 1st Cir.1963); Dunn v. Gentry, 653 So.2d 783 (La.App. 3rd Cir.1995), writ denied, 655 So.2d 335.
The West Baton Rouge Parish School Board is liable vicariously because Frank Ayio was its employee and was in the course and scope of his employment at the time of the accident. Robertson, supra.

Further following the above-cited cases, the burden of proof is on Mr. Ayio and the School Board to exculpate themselves from any negligence, however slight. In the Landry case, the First Circuit stated, "Where a passenger is not safely transported to his destination, the carrier bears the burden of proving its freedom from negligence, and must overcome the presumption against it by *898 a preponderance of the evidence." In Favorite v. Regional Transit Authority, 552 So.2d 487 (La.App. 4th Cir.1989), it was held that where there is proof of injury to a passenger, the burden shifts to the carrier to show that it is entirely free from fault.
The normal burden of proof in a personal injury case is upon the plaintiff. However, considering the "highest degree of care" owed by the school bus driver as part of his duty to safeguard the children in his care. The burden is upon Mr. Ayio to prove that he was not guilty of any dereliction, however slight, that caused the accident which is the subject of this case. Dunn v. Gentry, supra.

13. The Court finds that Mr. Ayio failed to meet his obligation to April as her school bus driver when he put her off the bus into the very arms of her waiting assailant, Fatonya Richard. The more credible evidence shows that Mr. Ayio afforded the students no supervision after their exit from the bus, even though he knew that April needed protection from the bullying Fatonya. (Footnote deleted.)
In Clomon v. Monroe City School Board, 572 So.2d 571, 577 (La.1990), the Louisiana Supreme Court elaborated upon the duty of a school bus driver to a child:
The process by which a child crosses an open highway to board or disembark from a school bus is charged with danger. Accordingly, the legislature has enacted the most stringent provisions feasible to safeguard the entire operation. The child, the bus driver and the motorist are constituents of this process, bound together legally and practically in a special, exigent relationship, from the moment the bus stops and signals until the child is safely across the roadway. See Westerfield v. LaFleur, 493 So.2d 600, 605 (1986). If the school bus driver and the motorist perform their duties properly, a child who crosses a typical roadway while leaving or entering an immobile signalized school bus is guarded from harm by a legal cordon during the entire time he is traversing the roadway. He and his parents are entitled to rely for his safe passage upon the motorist's observance of the safety zone and the bus driver's performance of his duty to activate highly visible signals, await the child's safe passage and report any motorist's violation of the legally protected passageway. The injury or death of a child during the protected receiving or discharge procedure can result in severe consequences for even an innocent motorist including criminal prosecution, civil damage suits, and moral opprobrium. Id.

In the cases cited by the trial court, the school children injured were either on the bus, or embarking or disembarking from the bus. In Dunn v. Gentry, 94-1164 (La.App. 3rd Cir.4/5/95), 653 So.2d 783, writ denied, 95-1148 (La.6/16/95), 655 So.2d 335, a child crossing the road to board a school bus became confused and was hit by a log truck. In Landry v. Travelers Indemnity Company, 155 So.2d 102 (La.App. 1st Cir.1963), a child riding the school bus was thrown forward and injured when the bus made a sudden stop. In Robertson v. Travis, 393 So.2d 304 (La. App. 1st Cir.1980), writs denied, 397 So.2d 805, 806 (La.1981), a bus driver parked her vehicle at the top of a hill and a child got out of the vehicle, attempted to cross the road and was hit by a car. In Bruno v. Fontan, 338 So.2d 713 (La.App. 4th Cir. 1976), writ refused, 341 So.2d 895 (La. 1977), a child riding a school bus with her arm resting in an open window was injured when the bus passed through an intersection and a stop sign hit her arm. In Favorite v. Regional Transit Authority, 552 So.2d 487 (La.App. 4th Cir.1989), a passenger on a public bus was injured when the bus was hit from behind by another vehicle.
We have found no cases, and the plaintiff has pointed out no cases to us, wherein a child safely disembarked from a bus, was *899 then injured by another child who had been on the bus, and the "common carrier" doctrine was applied. We do not believe that the "common carrier" doctrine applies to this scenario.
We find that, in this case, the common carrier doctrine no longer applied after April was safely delivered onto school grounds. At that point in time, any responsibility Mr. Ayio had for April was the responsibility of a teacher or supervisor for a student; therefore, the trial court erred in placing the burden of proof on Mr. Ayio to exculpate himself and prove that he was not guilty of any negligence that caused April's damages.

THE SUPERVISORY DUTY OF THE SCHOOL BOARD AND MR. AYIO
It is well established that a school board, through its agents and teachers, is responsible for reasonable supervision over students. However, this duty to supervise does not make the board the insurer of the safety of the children. Furthermore, constant supervision of all students is not possible nor required for educators to discharge their duty to provide adequate supervision. Before liability can be imposed upon a school board, there must be proof of negligence in providing supervision and also proof of a causal connection between the lack of supervision and the accident. Further, the risk of unreasonable injury must be foreseeable, constructively or actually known, and preventable if the requisite degree of supervision had been exercised. Said differently, educators are required to exercise only that supervision and discipline expected of a reasonably prudent person under the circumstances at hand. Obviously then, the failure to take every precaution against all foreseeable injury, ... does not necessarily constitute negligence. Adams v. Caddo Parish School Board, 25,370, 631 So.2d 70, 73 (La.App. 2nd Cir.1994), writ denied, 94-0684 (La.4/29/94), 637 So.2d 466.
It is well established that the fact that each student is not personally supervised every moment of each school day does not constitute fault on the part of the school board or its employees. Nicolosi v. Livingston Parish School Board, 441 So.2d 1261, 1265 (La.App. 1st Cir.1983), writ denied, 444 So.2d 1243 (La.1984); Harris v. Bogalusa City School Board, 393 So.2d 751, 752 (La.App. 1st Cir.1980).

ALLOCATION OF FAULT
Mr. Ayio testified that when he stopped at Cohn Elementary, April came to the front of the bus and told him that Fatonya was trying to fight her. When he stood up, Fatonya tried to swing around him to hit April. Mr. Ayio testified that he could not handle Fatonya, because she was larger than he was. Mr. Ayio put April and Fatonya off the bus and stood between them on the sidewalk. He then told them he was going to call the principal. He stood there and called for a teacher to go tell Mr. Washington, the principal, to come out to the front of the school.
Then, Mr. Ayio testified, "I got back on my bus because I was holding up traffic. I had some buses behind me and I told them to stand there. I thought they was stabilized, because, you know, they had quieted down after I told them I would get the principal. I got on my bus to pull my bus up so the rest of the buses behind me could go ahead on." He further stated that he pulled the bus up and, when he looked back, "[Fatonya] was on top of April." He indicated that other bus drivers pulled Fatonya off April.
April testified that when she got on the bus, Fatonya was sitting in April's assigned seat. Then, when April sat in another seat near the front of the bus, Fatonya pushed her out of that seat. Fatonya then took April's books and threw them in the back of the bus.
April went to get her books and testified "I set my books down and I told [Fatonya] I was going to hurt her." However, at this point April apparently moved back to the *900 front of the bus and told Mr. Ayio that Fatonya was threatening her. Mr. Ayio then got up and put both Fatonya and April off the bus. When Mr. Ayio got back on the bus to move it, Fatonya pulled April by her jumper, threw her on the ground and jumped on her. After Fatonya got up, April testified that she started swinging and hit Fatonya, getting one good lick in her face and causing Fatonya's face to bleed. At that point, Fatonya started stomping on April's leg. April testified that, after Mr. Ayio put her off the bus and talked to her, she started walking. She stated that the fight started only seconds later.
Based on the record before us, we find that Mr. Ayio was negligent. Knowing that Fatonya was threatening April, he placed the two of them together and left, albeit for only a slight period of time. Mr. Ayio did ask someone to summon the principal at the school; however, Mr. Ayio should not have left the children unsupervised under the circumstances. However, the fault of Mr. Ayio is slight in comparison to the fault of Fatonya in causing April's damages. We note that the incident was over very quickly and that a bus driver standing a few feet away broke up the fight.
Fatonya, who purposefully stomped upon April's ankle hard enough to break it, was larger than Mr. Ayio, who was 5'11" tall and 160 pounds. We note that testimony at trial established that Fatonya pounced upon April swiftly and fiercely, and a teacher standing a few feet away was unable to stop the fight before Fatonya broke April's ankle. Even if Mr. Ayio had not left momentarily to move his bus and had stood only a few feet away from the girls, his presence might not have deterred Fatonya from beating on April any more than the presence of several nearby teachers did. Based upon the facts of this case, we find that Fatonya was 85% at fault for the injuries to April and Mr. Ayio was 15% at fault. We find no independent fault on the part of the West Baton Rouge Parish School Board, although it is vicariously liable for Mr. Ayio's negligence.
As stated in Aucoin v. State through Dept. of Transportation and Development, 97-1938, 97-1967 (La.4/24/98), 712 So.2d 62:
Before 1996, article 2324(B) held defendants liable "solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages." The 1996 amended article revoked solidarity for non-conspiratorial acts and expressed defendant's liability as a "joint and divisible obligation. A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person...." That shift from solidary liability to joint and several obligation altered the existing rule. Moreover, since the amendment resulted in changing the amount of damages recoverable, the change was clearly substantive. Socorro v. City of New Orleans, 579 So.2d 931, 944 (La.1991). As such, the amendment can have only prospective application. La. Civ.Code art. 6. Therefore, the applicable article 2324(B) was that which existed at the time of the accident.
Aucoin, 1998 WL 205320, *5, 712 So.2d 62 (Footnote omitted).
Thus, under La. C.C. art. 2324 as it existed at the time of April's accident, Mr. Ayio and the West Baton Rouge Parish School Board are liable for 50% of April's damages, including medical expenses.

THE GENERAL DAMAGE AWARD
According to the records from Earl K. Long Memorial Hospital, April was admitted to the hospital on October 9, 1992, and her foot was kept elevated for two days. April underwent surgery to insert pins into her ankle on October 12, 1992, and was discharged the next day. She was given Tylenol # 3 upon discharge.
Dr. Lawrence J. Messina, an orthopedic surgeon who saw April in May of 1994 and *901 February of 1996, testified for the plaintiffs. In a letter written to plaintiffs' attorney in May of 1994, he stated that April stood and walked with a normal gait. She had no atrophy of the leg and had a well-healed surgical scar on the left ankle. Further, he wrote that she was left with "an eight percent impairment in regards to the function of her lower extremity," and she was at an increased risk of developing arthritic changes in the ankle joint.
Dr. Messina testified in pertinent part as follows:
Q. You had given her a disability of eight percent. Was that eight percent whole body or of the leg or lower extremity?
A. That's an eight percent impairment in regards to the function of her leg. And that's the result of the limitation in the range of motion that she has in her ankle joint.
Q. You said she walked reasonably well. Did you do anything with her, for example, like climbing up and down steps, things of that nature?
A. No, I didn't ask her to climb up and down steps in my office. Unless I take her to the stairwell, I don't have steps for her to climb up and down. But it's reasonable to think that with the limitation in motion that she has, that it's possible that she may have some problems going up and down stairs with that foot. I think that she'd be able to do it, but I don't think she'd be able to do it with as much ease as you or I may be able to go up and down stairs since we have full motion in our ankles.
Q. If she is in a position where she has to do a lot of going up and down steps or whatever, over a period of time will that have a tendency to either cause her discomfort or cause deterioration in the joint, the arthritis?
A. Probably. I think it would probably cause herit's possible that it would cause her discomfort in that I think she would change the way she went up and down stairs. For example, instead of trying to go up and down stairs on her toessay she goes up stairs on her toes, as opposed to doing that she may then put her whole foot flat on the floor. And when she's going up the stairs, maybe it will make her walk up slower than you or I might. Going down the stairs, it really shouldn't make too much difference.
Q. How about running, is she going to have a problem with running?
A. The amount of motion that she has is enough to allow her to run, but again, she might not run as fast as she would if she had better motion in her ankles.
Q. Does she have any otherapart from the problem in her ankle, any other problems with her feet, whether they are of a traumatic nature or otherwise?
A. I didn't detect anything when I examined her on either occasion.
Q. The impairment rating that you gave, is that basically out of the orthopedic handbook?
A. There's an AMA guide to permanent impairment and that's what I'm asked to use for workers' compensation, so I justin an effort to be fair and consistent, I use it for everybody.
Q. You noted that she complained of problems with weather changes. Is that something that you would feel normally?
A. That's consistent with the interarticular nature of her injury, yes, sir.
Q. Will that change as she gets older?
A. Probably not.
Q. You also mentioned that she still has the hardware in her ankle.
A. Yes, sir.
Q. What exactly does she have in her ankle?
A. She has some screws.
Q. And you had recommended that that be removed?

*902 A. When I saw her the last time in February of this year, she was tender over her hardware. And I told the mother that at this stage, since from the time of her accident being several years, there's certainly no reason why you couldn't take that out. Sometimes patients will have tenderness over the hardware, they will develop a bursa over a prominent screw head which may cause symptoms and they then feel that if you take that screw head out, you will cause the bursa to go away, or you can cut the bursa out at the time you do the surgery and that will cause an alleviation of the symptoms. The only thing I explained to this girl's mother was that I felt she ought to do it in the summertime so that it wouldn't interfere with school. It's not that urgent of a thing. I mean, I think it's kind of a semielective type procedure.
Dr. Messina further testified that he did not restrict April's activities in any way, and he did not prescribe any pain or antiinflammatory medication for her on her second visit.
The trial court awarded April $150,000 in general damages. Before a court of appeal can disturb an award of general damages made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making the award. Only after making the determination that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded the court. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976). Only after such determination of abuse has been reached is a resort to prior awards appropriate under Coco for purposes of then determining what would be an appropriate award for the present case. Reck v. Stevens, 373 So.2d 498, 501 (La.1979).
When we consider the fact that the general damage award for wrongful death ranges from $100,00 to $200,000, with $150,000 being the norm, it becomes obvious that $150,000 for this injury is an abuse of discretion. See, e.g., Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96); 666 So.2d 612 (15-year old boy killed in car accident, father awarded $150,000 general damages); Campbell v. Department of Transportation and Development, 94-1052 (La.1/17/95), 648 So.2d 898 (each parent awarded $150,000 general damages for death of son killed in car accident); Anderson v. NOPSI, 583 So.2d 829 (La.1991) 3-year old killed in pedestrian/bus accident, single mother awarded $150,000).
A survey of awards given for similar injuries indicates to us that the highest amount that could be awarded for April's injury is $80,000; therefore, the general damage award is reduced to the sum of $80,000. See e.g., McIntyre v. Saunders, 554 So.2d 1371 (La.App. 1st Cir.1989), writ denied, 558 So.2d 583 (La.1990) ($95,000 general damages to man in his thirties who underwent surgery with placement of two steel pins into his ankle, may need surgery to remove the pins and had fifty percent impairment of his ankle with permanent restriction in his activities); Wheat v. State Farm Fire & Casualty Co., 583 So.2d 1 (La.App. 1st Cir.), writs denied, 583 So.2d 1145 (La.1991) ($60,000 general damages to woman who sustained an "extremely painful" rotational fracture to the tibia resulting in 10 percent loss of motion in her ankle and 5 percent permanent disability to the lower leg); Arthur v. State, DHHR, 605 So.2d 635 (La.App. 4th Cir.1992) ($65,500 general damages to 80-year old woman who sustained fractured ankle requiring surgical insertion of plate and six screws, developed significant residual problems and was confined to a wheelchair at trial); Braud v. Painter, 730 F.Supp. 1 (M.D.La. 1990) ($30,000 general damages to man in fifties who sustained ankle fracture requiring surgery with plate and screw, used crutches for several months, and sustained a five percent disability).

*903 THE AWARD FOR LOSS OF EARNING CAPACITY
The trial court awarded April $40,000 for loss of earning capacity. The court found:
21. There was no expert testimony with regard to the loss of future earning capacity. Because April is only entering high school at this point, this element of damages is quite difficult. In general, such an award is speculative by its very nature.
22. April lost a full year of school because of her injury. Despite a visiting teacher, she fell behind and had to repeat fifth grade. The Court notes from its observations and questioning of April and from her academic record that it appears unlikely that April will be suited for "white-collar" employment. The case law has repeatedly recognized that individuals with physical impairment, particularly of the lower extremities, are disadvantaged, not only in securing manual employment, but also in their ability to perform and, thus, maintain steady employment. Considering April Bell's position and condition, the Court feels that April will suffer a loss in her earning capacity throughout her work life. That work life will be some forty (40) to forty-five (45) years, and the Court finds that an award for lost earning capacity of FORTY THOUSAND AND NO/100 ($40,000.00) DOLLARS, while not generous, will adequately compensate plaintiff for this element of damages.
(Footnote omitted.)
An award for loss of future earning capacity is not predicated only on the difference between a person's earnings before and after the disabling injury. It encompasses the loss of the person's potential or earning capacity, the loss or reduction of a person's capability to do that for which he is equipped by nature, training, and experience, and for which he may be recompensed. Morris v. State, Department of Transportation, 94-2545 (La.App. 1st Cir.10/6/95), 664 So.2d 1192, 1198, writ denied, 95-2982 (La.2/9/96), 667 So.2d 537. Although lost future earnings does not have to be proven to a mathematical certainty, a plaintiff must present evidence which proves that a loss of earning capacity has, in fact, been sustained. Housley v. Cerise, 597 So.2d 71, 74 (La. App. 4th Cir.), writ denied, 600 So.2d 646 (La.1992).[2]
Herein, there was no evidence of loss of earning capacity presented at trial, thus the trial court erred in awarding damages for loss of earning capacity. Therefore, that portion of the trial court judgment awarding damages to April for loss of earning capacity is vacated, as there was no factual basis for it and it was based on pure speculation.

DECREE
Therefore, for the foregoing reasons, the trial court judgment is REVERSED in part, VACATED in part and AFFIRMED in part as follows: fault is assessed 85% to Fatonya Richard and 15% to Mr. Ayio; the general damage award is reduced to $80,000; the loss of earning capacity award is vacated; the $3,000 award for future medical expenses is affirmed and the $365 award for the services of Dr. Messina is affirmed. Under La. C.C. art. 2324, as it existed at the time of April's accident, Mr. Ayio and the West Baton Rouge Parish School Board are solidarily liable for 50% of the general damage award, or $40,000; for 50% of the future medical expenses, or $1,500; and for 50% of the award for the services of Dr. Messina, or $182.50. Costs are assessed against Lyannie and April Bell.
FOGG, J., dissents and assigns reasons.
GUIDRY, J., dissents in part and concurs in part and assigns reasons.
*904 FOGG, J. Dissenting in Part and Concurring in Part.
I concur in the majority opinion to the extent that it vacates the award of damages for loss of earning capacity. However, I respectfully dissent from the majority's assessment of fault and damages. I believe Frank Ayio is 50% at fault for the injuries April Bell suffered. Additionally, I would not disturb the trial court's damage award.
GUIDRY, J., concurring in part and dissenting in part.
I concur in the majority opinion to the extent that it vacates the award of damages for loss of earning capacity, affirms the award for future medical expenses, and affirms the $365.00 award for the services of Dr. Messina.
I respectfully dissent from the portions of the majority opinion with respect to the assessment of fault, the reduction in the general damage award, and the assessment of all costs to April Bell.
NOTES
[1] We note that the bus driver's name is spelled both as "Ayo" and "Ayio" in the record; however, forms filled out by Mr. Ayio (or on his behalf by his daughter) reflect that the correct spelling is "Ayio."
[2] This is the hazard of a trial judge not making his own findings of fact but, instead, relying on those of an advocate who has an interest in the outcome of the case.