775 So.2d 683 (2000)
Louis PAYNE, Jr.
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Priscilla H. Doucet and May Dawson.
Steve Fontenette
v.
State Farm Mutual Automobile Insurance Company, Priscilla H. Doucet and May Dawson.
Nos. 99 CA 2737 and 99 CA 2738.
Court of Appeal of Louisiana, First Circuit.
December 22, 2000.
*684 C. Scott Reis, Rebecca A. Cunard, Counsel for Plaintiff-Appellee Louis Payne, Jr.
Nicholas Canaday, III, Counsel for Plaintiff-Appellee Steve Fontenette.
William F. Janney, Counsel for Defendants-Appellants State Farm Mutual Automobile Ins., Co., and Priscilla H. Doucet.
Before: LeBLANC, KUHN and MOORE,[1] JJ.
MOORE, J.
This consolidated appeal involves a multi-vehicle accident that commenced on U.S. Highway 61 North, (Airline Highway) and ended in the parking lot of the Colonial Shopping Center, west of the Airline Highway. Plaintiffs, Louis Payne, Jr., (Payne) and Steve Fontenette (Fontenette) brought separate suits against the drivers of the automobiles involved in the Airline Highway mishap, contending that they, Payne and Fontenette, were injured while occupying their parked vehicles outside Fontenette's establishment, the Apollo Blues Club. The sole issue before the trial court was whether Payne and Fontenette were in fact occupying their respective vehicles at the time of the accident. The trial court, after considering the evidence in the case, concluded that the plaintiffs were occupying their vehicles and suffered injuries. The trial court awarded damages to Payne in the amount of $9,865.65 and to Fontenette in the amount of $50,000.00.
State Farm Mutual Automobile Insurance Company, and its insured, Priscilla Doucet (Doucet), bring this appeal asserting that the trial court committed legal error in concluding that Payne and Fontenette were actually occupying their respective vehicles when the parking lot collision occurred.

FACTUAL BACKGROUND
On February 26, 1996, Doucet, operating a 1985 Buick in a northbound direction on Airline Highway, rear-ended a 1995 Toyota operated by May Dawson (Dawson). The accident occurred on the Airline Highway in the northbound lanes. After the initial impact, the Dawson vehicle traveled across the southbound lanes of Airline Highway and entered the Apollo Blues Club parking lot, adjacent to a part of the Colonial Plaza Shopping Center lot, and subsequently collided with a parked 1993 Ford Taurus *685 owned by Payne. Payne's Taurus was then knocked into a parked GMC Silverado pickup truck owned by Fontenette. These facts were established by a joint stipulation reduced to writing and entered into evidence[2]. It was further stipulated that the sole cause of the accident between the Dawson and Doucet vehicles was the negligence of Doucet. The parties stipulated that neither plaintiffs' damages would exceed the sum of $50,000.00, exclusive of interest and costs, and that State Farm had provided a policy of insurance in favor of Doucet.
State Farm and its insured appeal the judgment of the trial court and assert the following assignments of error:
1) The trial court committed legal error by shifting the burden of proof to the defendants and the appellate court should conduct a trial de novo on the factual issues presented.
2) The trial court erred in entering judgment in favor of the plaintiffs. This court should reverse that judgment by finding Payne and Fontenette did not occupy their vehicles at the time of the accident.
3) The trial court's finding that Payne and Fontenette carried their burden of proof was manifestly erroneous and must be reversed.

DISCUSSION OF ASSIGNMENT NO. 1
It is elementary tort law that the plaintiff bears the burden of proving by a preponderance of the evidence each element of his cause of action. As such, the plaintiff bears the burden of proving the existence of an injury as well as the connection between the injury sustained and the accident which caused the injury. Fontana v. Louisiana Sheriff's Automotive Risk Program, 96-1579, p. 4 (La.App. 1 Cir. 6/20/97), 697 So.2d 1030, 1033, writ not considered, 97-2363 (La.10/3/97), 701 So.2d 190, on reconsideration writ denied, 97-2363 (La.1/9/98), 705 So.2d 1088. "Burden of persuasion" is defined in article 302 of the Louisiana Code of Evidence as follows:
[T]he burden of a party to establish a requisite degree of belief in the mind of the trier of fact as to the existence or non-existence of a fact. Depending on the circumstances, the degree of belief may be by a preponderance of the evidence, by clear and convincing evidence, or as otherwise required by law.
In our context, this means that the plaintiffs are obliged to present proof by a preponderance of the evidence that they were involved in an accident caused by the defendant's fault resulting in compensable damages. The plaintiffs must prove that they were occupying their respective vehicles at the time of the accident. Appellants argue that the trial court committed legal error by shifting the burden to the defendants instead of requiring the plaintiffs to prove their case by a preponderance of the evidence.
In its reasons for judgment, the trial court stated:
In spite of the conflicting testimony, there was no evidence put on by the defense to show that these injuries did not result from this accident.... These injuries for this plaintiff were not all subjective. There were objective symptoms of this trauma. There has not been anything to show that it was received from any other injury. Mr. Janney said, well, you can get this from playing basketball, true, but then he'd come in and show in which basketball game he got it, and there was not that in this case.
It is axiomatic that the trial court was free to accept or reject, in whole or in part, the testimony of any witness. Morrison v. Morrison, 97-0295, p. 5 (La.App. 1 Cir. 9/19/97), 699 So.2d 1124, 1127. However, the court improperly placed the burden of proof on the defendants to present plausible alternative explanations for the *686 plaintiffs' injuries. We, therefore, find that the learned trial court committed legal error by applying an incorrect legal standard. Where the trial court committed legal error, this court is required to determine the facts de novo from the entire record and render a decision on the merits. Bell v. Ayio, 97-0534, p. 4 (La. App. 1 Cir. 11/13/98), 731 So.2d 893, 897. Therefore, we review de novo, whether it was more probable than not that Payne and Fontenette were occupying their vehicles at the time of the collision.
Officer Darryl Armentor was the primary investigating officer for the Baton Rouge Police Department. Officer Armentor had very little personal recollection of the accident and he relied upon his report in giving his testimony. His accident report had no notation that either Payne or Fontenette were occupying their vehicles at the time of the collision. Officer Armentor focused his initial attention upon the Dawson vehicle, which had struck at least one vehicle in the parking lot. Officer Armentor observed two ladies sitting in the car with a fire truck parked next to the vehicle. The Payne and Fontenette vehicles were observed to have been damaged according to some physical evidence noted by Officer Armentor. As to Payne's vehicle, Officer Armentor testified that the information he had caused him to believe it was unoccupied and that when he went over to the Payne vehicle he noted that it was unoccupied. Officer Armentor conceded he had no personal knowledge if anyone was in the Fontenette vehicle, but Officer Armentor did recall Fontenette being at the scene, described as being one of pandemonium.
Officer Armentor testified that he spoke with Fontenette several weeks after the accident when Fontenette came to the District Police Office on Plank Road. At that time Fontenette told Officer Armentor that he was inside the truck when the accident occurred and that he had registration papers on the truck to prove his ownership. Officer Armentor the prepared a supplemental report indicating that Fontenette was in the vehicle at the time of the accident. Of Fontenette, Officer Armentor said, "He seemed to remember telling me he was in the vehicle at the time. I don't remember him telling me that."
After talking to Fontenette, Officer Armentor called Payne on the telephone and Payne reported that he was in his vehicle at the time of the accident. Both Fontenette and Payne then reported having an injury as a result of the accident.
On cross-examination, Office Armentor testified as to his normal routine he would perform following arrival on the scene. One of the aspects of investigating the accident and preparing the accident report is to contact each driver involved in the accident and ask them what had happened. Officer Armentor recalled having a conversation with Fontenette the day of the accident, but that the only information the officer noted was that Fontenette's vehicle had been struck, not that he was in the vehicle at the time of the accident. Officer Armentor testified that if Fontenette had told him he was an occupant of the vehicle at the time of the accident, he probably would have noted that information on his report. A later discussion between Officer Armentor and the Robinsons, witnesses to the accident, indicated that the Payne and Fontenette vehicles were unoccupied at the time of the accident.
When Fontenette discussed the accident with Officer Armentor at the District Office three weeks after the accident, Fontenette gave no information as to how the accident occurred. Similarly, although Officer Armentor remembered speaking with Payne at the scene of the accident, Payne likewise did not indicate to Armentor at the accident scene that he was inside his vehicle when it was struck. Payne's vehicle was listed as being unoccupied on the accident report and Officer Armentor testified he would have questioned Payne as to how the accident occurred had he been *687 occupying the vehicle at the time of the impact.
Michelle Robinson was called by the defense. She testified that she witnessed the accident while riding as a passenger with her aunt, Linda Robinson. Her testimony included the following:
A. I just heard of lot of commotion going on and I looked up and I saw a car careening across the median into the parking lot where I was sitting. And the vehicle struck cars that were parked there. And it turned, the vehicle as it hit the cars it made a u-turn into the parking lot and it finally stopped.
Q. How many cars were hit?
A. I'm not sure.
Q. Do you know if a truck was also involved?
A. Yes.
Q. So at least one car was hit and at least one truck was hit in the parking lot?
A. Yes.
Q. And these were cars that were parked in the lot?
A. Yes. They were not moving.
Q. Was anyone in those parked vehicles that were struck?
A. No, Sir.
Q. No one was in the pickup truck?
A. No, Sir.
Q. And no one was in the vehicle next to the pickup truck?
A. No, Sir....
Q. Okay. From the time the accident occurred and as you walked to the ladies' car, did anyone get in or out of those parked vehicles?
A. Not that I'm aware of....
Q. How can you be sure no one was in the parked vehicles?
A. When the cars hitI mean I followed the accident as I just looked all the way across the roomacross the parking lot and I looked to see was someone in the vehicles, you know and I didn't see anything.
Michelle Robinson testified that she could see into the passenger compartments of both the car and the truck and saw no one. A prior inconsistent statement by Michelle Robinson, given at an earlier deposition, indicated that she could not see down into the parked car or parked truck. Nevertheless, Michelle Robinson testified at trial, unequivocally, that she could see over into the car and truck and observed no one occupying the vehicles at the time of the accident.
Linda Robinson, aunt of Michelle, testified next. She testified that she and her niece were in the Colonial Shopping Center parking lot when the accident occurred. Linda Robinson testified that she saw a vehicle, coming at such a high rate of speed that she feared that it might come into contact with her vehicle, so she backed up her vehicle. She testified that she watched the Dawson vehicle as it came across Airline Highway, across the median, veered in front of her and then to the right. She observed the car enter the parking lot and strike the Payne vehicle, which was then knocked into the right wheel of the Fontenette truck. Linda Robinson testified that she could not see anyone in the parked vehicles. After the impact, Linda Robinson exited her vehicle and ran across the parking lot looking for a telephone. She testified that she ran by one of the impacted vehicles toward the front door of the Apollo Blues Club. She looked into both the Payne automobile and the Fontenette truck to make sure no one was in there. Seeing none, she then went into the Apollo Blues Club. She gave detailed testimony as to where she walked, where she looked and that she was close enough to touch both vehicles, which she determined to be empty.
Once in the Apollo Blues Club, declaring that there had been a wreck, she asked someone to please call 911. However, no one appeared to take any action. She repeated her exclamation that a lady was *688 hurt, possibly having a heart attack. Again, no action was taken by anyone within the lounge. Linda Robinson testified she finally got someone's attention inside the lounge by inquiring in a loud manner "Is anyone out there driving a show truck?" Someone inside said "yea" and Linda Robinson advised that it had been hit as a result of an accident. Linda Robinson stated that, at that time, maybe three or four people passed right by her. Linda Robinson testified that she recognized the plaintiffs as being two of the three or four people that exited the lounge and went outside.
Sometime after the accident Linda Robinson received a call from Fontenette, identifying himself as the owner of the Apollo Blues Club, and advising that he needed to talk to her about the accident. According to Linda Robinson's testimony, Fontenette had already talked with her niece, Michelle, and that "my niece had already messed him up and that he needed me not to mess him up, that I needed to go along with some statements that he had made and that he had also gotten the police officer to go along with his statement with his statement and that his attorney had told him that all he needed to do was talk to me and get me to saygo along with his statement or something of that nature." Linda Robinson gave explicit testimony that Fontenette had solicited her to change her statement that she had initially given the police and that he asked her to state that he was in the vehicle when his vehicle was hit. Linda Robinson's response to Fontenette was that the only thing that she was going to do was say what she saw. Specifically, Linda Robinson testified as follows concerning her conversation with Fontenette:
A. He said that at least, if I wasn't going to go along with what he said to just not to say anything, to not to mess him up and that this would notit wasn't like he washe said he was suing an insurance company and that it wasn't going to have to do anything to do with like money out of anybody's pocket, but that whatever he was going to get because he was like it's not the ladies or something like that, it's the insurance companies. And that whatever he got out of his settlement with the insurance company, that he would make it worth my while that whatever he got he would give me a portion for saying that he was in the vehicle.
Q. Now you feel pretty clear about that?
A. Yes, Sir.
Q. Is there any room for misinterpretation in your mind?
A. No, Sir.
Q. Are you sure he didn't offer any more than just lunch and any lost wages if you were to come to court and testify on his behalf?
A. He never mentioned anything about a lunch or lost wages or anything. What he made clear to me is the thing was against the insurance companies and something about the rates that we pay as far as insurance premiums or whatever that the companies wouldn't be out of a loss or anything like that and for me, you know, like I didn't really have to feel bad about doing anything because it wasn't money out of anyone else's pocket. And he was trying to get me to understand that it was just an insurance company and that he would make it worth my while that whatever the settlementhe said whatever the settlement was that he would assure that I would get a satisfied portion of it.
Despite vigorous examination by counsel for appellees, Linda Robinson was steadfast in her testimony as to what she saw, where she saw it from and what happened within the Apollo Blues Club when she sought help. Further, she maintained that she was contacted by Fontenette in an attempt to change her previous statement to the police to a statement favorable to Fontenette and contrary to her actual eyewitness observation.
*689 The final defense witness was Wayne Robinson, Linda Robinson's husband. Wayne Robinson testified that he received a call from Fontenette some time after the February 26, 1996 accident. Wayne Robinson testified that Fontenette asked Robinson to talk to his wife, Linda, in reference to the accident. Fontenette wanted Wayne Robinson to ask Linda if she would say he was in the vehicle and to get his niece Michelle to corroborate Fontenette's version. Wayne Robinson responded that he would have to talk to his wife and that it would be up to her as to whatever she said. Fontenette contacted Wayne Robinson a second time wanting to know if he had in fact talked to his wife and would they come to the Apollo Blues Club to discuss the matter and that "it would be beneficial to us if we did ." Elaborating, Wayne Robinson testified that Fontenette said that, of whatever money he got he would make it beneficial and split the settlement with them. Wayne Robinson responded that he would allow Fontenette to talk to his wife and that whatever his wife saw, "she would have to give her testimony in court or talk to whoever because I didn't know anything about the accident."
On a third occasion, Wayne Robinson recalls working in his yard whereupon Fontenette drove up and asked yet again if Wayne would talk to Linda and Michelle in reference to the accident. Wayne Robinson testified that he had advised Michelle that Fontenette had come by and asked him to talk to Michelle about the accident. Michelle had relied to Wayne that she was not going to "go and lie, saying that that he was in the vehicle if he wasn't in there."
The only persons placing Payne and Fontenette in their respective vehicles at that time of this parking lot mishap were the plaintiffs themselves. With no corroboration and only the plaintiffs' self-serving testimony to prove the element of occupancy in the vehicles, we cannot say that the plaintiffs have borne their burden of proving that more probably than not they were in fact occupying their vehicles when the Dawson vehicle struck the Payne vehicle in the parking lot.
It is highly improbable that both Fontenette and Payne would omit to tell Officer Armentor that they were inside each of their vehicles at the time of the accident. Neither plaintiff offered an explanation as how the accident happened, even during the subsequent visit to the District Office by Fontenette and the follow-up telephone call made by Officer Armentor to Payne. Both Linda and Michelle Robinson, uninterested impartial witnesses, directly refuted the plaintiffs' testimony. Fontenette's testimony is rendered even more suspicious by his actions in attempting to influence the testimony to be given by Linda and Michelle Robinson.

CONCLUSION
We, therefore, conclude in our de novo review that the plaintiffs, Louis Payne, Jr. and Steve Fontenette, did not carry the burden of proving they were occupying their vehicles at the time of the accident. Having failed to prove an essential element of their claims, the trial court's judgment in favor of the plaintiffs is REVERSED.
Having determined that assignment of error number 1 is meritorious and requires reversal, we pretermit consideration of appellants' additional assignments of error. All costs of appeal are assessed to plaintiffs-appellees.
REVERSED.
NOTES
[1] Judge D. Milton Moore, III, of the Fourth Judicial District Court is serving as judge protem. by special appointment of the Louisiana Supreme Court.
[2] Joint Exhibit # 1.