653 So.2d 783 (1995)
John E. DUNN, Sr., et ux, Plaintiffs-Appellants,
v.
Crayton GENTRY, et al., Defendants-Appellees.
No. 94-1164.
Court of Appeal of Louisiana, Third Circuit.
April 5, 1995.
Writ Denied June 16, 1995.
*784 Rebel Garnett Ryland, Columbia, Cynthia Tregle Woodard, Russell Alan Woodard, Ruston, Louis Champagne, Columbia, for John E. Dunn et ux.
Bryan David Scofield, Samuel Newman Poole Jr., Alexandria, James Francis Slaughter, Colfax, for Eric S. Cormane Grant Parish School Bd.
Billy Lynn West Jr., Natchitoches, for Colfax Timber Co., LIGA.
Hugo A. Holland Jr., Shreveport, for Bobby Lambert.
Before YELVERTON, SAUNDERS and SULLIVAN, JJ.
YELVERTON, Judge.
Six year old Jamie Dunn was killed trying to board a school bus which was stopped to pick him up on the opposite side of the road from his house. It happened on a state highway in Grant Parish in April 1989 at about 7:15 in the morning. The child was hit in the head by the right front corner of a loaded log truck that was traveling in the opposite direction from the school bus. After settling with the driver of the log truck, the parents, John E. and Eva P. Dunn, went to trial against Eric Scott Cormane, the driver of the school bus, the Grant Parish School Board, Cormane's employer, and United Community Insurance Company,[1] their insurer. A jury tried the case as to Cormane. The first question on the verdict sheet was whether Cormane was at fault in causing the accident. The jury answered no. About three months later the trial judge, ruling on the School Board's liability in the bifurcated case, reached the same result as to the School Board. The Dunns appealed. We reverse. We find that Cormane was equally at fault with the driver of the log truck in causing the accident. We award each of the Dunns $250,000 in damages, reduced by the settling party's fault, and interest and costs.

FACTS
The log truck driver and the school bus driver were the only witnesses to the accident. Jamie had been standing off the road in his driveway. To get on the bus, he had to go all the way across the road in front of the bus to enter the bus door on the far side. He ran out to the center of the road, then turned and ran back. He almost made it back. The log truck hit him just before he cleared its path, instantly killing him.
Cormane was a substitute school bus driver that day. He was stopped in the westbound lane across the road from Jamie's house. His red lights were not activated and his semaphore stop signs were not extended. He said that the reason he had not turned on his red lights and put out his stop signs, features activated by opening the door, was because he did not want to open the door. He said that opening the door would be a signal to the child to board the bus. The *785 reason he did not want to give the child a signal to board the bus, he explained, was because he discovered after he stopped that there was a log truck some 150 yards west, coming his way. The road ahead of him, down which the log truck was coming, was straight and the view unobstructed for two miles.
The log truck driver, Crayton Gentry, testified that when he was 200 yards away from the school bus he saw a child running into the roadway. His loaded truck was traveling 35-40 miles an hour. He said he immediately got on his brakes. He said he saw the child cross the middle of the road then turn and look at the log truck. The child then turned around and ran back toward his house. The boy was on the shoulder when the truck hit him. Two of the six brakes on the log truck were inoperative.
Jamie's first grade teacher testified that she taught him to watch for a signal from the school bus driver before crossing the road to get on the bus. She said he was an average student. The boy's parents were in the house when the accident happened.
Cormane's testimony as to what he was doing while all this was going on was confusing and inconsistent. He said as he sat there he was looking back and forth at Jamie, who was standing on the side of the road, and the log truck, which was trying to stop. He could not remember whether his bus window was open or not. At one point he testified that he was looking but not signaling to Jamie. He said he looked at the log truck and when he looked back the boy was in the middle of the road coming across. He was not looking at the child when he started crossing the road and got to the center. When he saw Jamie in the center of the road, he did not open the school bus door, nor did he yell. Elsewhere in his testimony he stated that he never saw the boy turn around, seeing him only when he actually got hit by the log truck. He was insistent that he never made eye contact with the child. Once he stated that he attempted to signal Jamie to stay back, but he did not think Jamie saw him. He had two hand signals, one to cross and the other, a palm up signal, to stay. At trial, he could not remember whether or not he made any hand signal. In a deposition earlier he had said "I looked back at the truck and my eyes was kind of glued on the truck seeing if he was going to be able to stop or not for me to open that door to give the kid an okay to cross the road." At the trial, explaining this statement regarding whether his hand was up, he said "I ... (Inaudible) said that I thought I did, I made that contact. I kept the hand up there. I don't know if I did or not." Again, "I know my hand was resting there to ... to make the motion. Now, I don't know if my hand was up or it went down or went back up. I don't know."
Dr. Olin K. Dart, Jr., a consulting traffic engineer, testified for Cormane and the School Board, and stated that this truck at 40 m.p.h. was going 58.7 feet per second, and with full braking capacity it could have stopped in 107 feet. He was never asked the effect of the reduced braking power in this instance on the stopping distance. The truck stopped 70 feet beyond where it hit the child.
Trooper Michael Hataway, of the Louisiana State Police, was accepted as an expert in braking systems. He testified for the defendants. He assisted in the investigation of this accident. He found two of the six brakes on the truck were inoperative, and testified that this loss of one third of the braking ability of the truck would have extended the distance required for stopping. He did not say how far.

LAW
The statute governing equipment for this school bus, La.R.S. 32:318, requires that it be equipped with two semaphore stop signs containing flashing red lights. La.R.S. 32:318(B)(2). The bus was so equipped. The statute governing receiving and discharging children from school buses, La.R.S. 32:80, provides that a school bus driver must activate the bus' alternately flashing signal lights whenever he stops or is about to stop on the highway for the purpose of receiving or discharging children. La.R.S. 32:80(B)(1) and (2). The school bus driver, Cormane, did not comply with this statute. The driver of a vehicle on a highway approaching a school bus that has stopped to receive or discharge *786 school children must stop his vehicle not less than 30 feet from the school bus when its signal lights are flashing and not proceed until its signals are off or the bus resumes its trip. La.R. 32:80(A)(1).
In Clomon v. Monroe City School Bd., 572 So.2d 571 (La.1990) our Supreme Court said:
The process by which a child crosses an open highway to board or disembark from a school bus is charged with danger. Accordingly, the legislature has enacted the most stringent provisions feasible to safeguard the entire operation. The child, the bus driver and the motorist are constituents of this process, bound together legally and practically in a special, exigent relationship, from the moment the bus stops and signals until the child is safely across the roadway. See Westerfield v. LaFleur, 493 So.2d 600, 605 (1986). If the school bus driver and the motorist perform their duties properly, a child who crosses a typical roadway while leaving or entering an immobile signalized school bus is guarded from harm by a legal cordon during the entire time he is traversing the roadway. He and his parents are entitled to rely for his safe passage upon the motorist's observance of the safety zone and the bus driver's performance of his duty to activate highly visible signals, await the child's safe passage and report any motorist's violation of the legally protected passageway. The injury or death of a child during the protected receiving or discharge procedure can result in severe consequences for even an innocent motorist including criminal prosecution, civil damage suits, and moral opprobrium. Id.

In Louisiana school buses are considered to be common carriers and as such the driver of a school bus must exercise the "highest degree of care" for school children whose safety is entrusted to him. Robertson v. Travis, 393 So.2d 304 (La.App. 1st Cir. 1980), writ denied 397 So.2d 805, 806; Bruno v. Fontan, 338 So.2d 713 (La.App. 4th Cir. 1976); Landry v. Travelers Indemnity Co., 155 So.2d 102 (La.App. 1st Cir.1963); Sepulvado v. General Fire and Cas. Co., 146 So.2d 428 (La.App. 3rd Cir.1962).
The Grant Parish School Board is liable vicariously because Cormane was its employee and was in the course and scope of his employment at the time of the accident. Robertson, 393 So.2d at 315.

BURDEN OF PROOF
The burden of proof was on Cormane to exculpate himself from any negligence, however slight. In Landry, 155 So.2d at 103, the court stated "... where a passenger is not safely transported to his destination the carrier bears the burden of proving its freedom from negligence and must overcome the presumption against it by a preponderance of the evidence." The rule that the burden of proof shifts in such cases is also recognized in Bruno, 338 So.2d at 715, and in Favorite v. Regional Transit Authority, 552 So.2d 487, 488 (La.App. 4th Cir.1989), which held that where there is proof of injury to a passenger, the burden shifts to the defendant carrier to show that it was entirely free of negligence contributing to the damage. This shifting of the burden of proof necessarily requires that in order to absolve itself from liability, the defendant must prove not only that the other vehicle which was involved in the accident was at fault, but also that that fault was the sole cause of the injury. Id. at 488.
The normal burden of proof in a personal injury case is upon the plaintiff. However, considering the "highest degree of care" owed by the school bus driver as part of the cordon guarding this child, and the jurisprudential requirement for the shifting of the burden of proof, the burden was on Cormane to prove that he was not guilty of any dereliction, however slight, that caused the accident which is the subject of this case. See Ferrell v. Fireman's Fund Ins. Co., 650 So.2d 742 (La.1995), No. 94-C-1252 (February 20, 1995).

TRIAL COURT ERROR
Although the trial court was requested to give a charge in accordance with the above jurisprudence instructing the jury that it was Cormane's burden of proof to show that he was not guilty of any fault, however slight, causing the accident, the trial court declined to give that instruction. Instead, *787 the trial court instructed the jury that the burden of proof was on the plaintiffs throughout to prove that Cormane was at fault and that his fault was a cause-in-fact of the accident. Some three months later when the trial court ruled on the bifurcated issue of the liability of the School Board, the court presumably instructed itself similarly as to burden of proof, finding that the plaintiffs had failed to prove that Cormane was guilty of fault, and that therefore the School Board was not vicariously liable.
This was error. We note from the record that after the charges were read and the jury retired to deliberate, court was reconvened and the jury was reseated. The court announced that it understood it was necessary to re-read the entire charge, which was done. After the charges were re-read in their entirety, the jury was again retired to deliberate. Therefore, the erroneous instruction as to burden of proof was given to the jury twice.
Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record. Ferrell, 650 So.2d at 742, No. 94-C-1252 (February 20, 1995).

CORMANE'S PROOF
We conclude that Cormane failed to carry his burden of proof to exculpate himself from negligence. First, the evidence suggests that Cormane should have put out his stop sign semaphores when he was about to stop, and that his failure to do so was a cause-in-fact of the accident. Second, the evidence suggests that Cormane had a second chance to prevent the accident as the boy was crossing the road, and failed in his duty at that time.
When the school bus came round a bend just before reaching the Dunn house, the road ahead was straight and unobstructed for two miles. It was down that road that the log truck was coming. Yet, unaccountably, Cormane did not see it until, by his estimate, it was 150 yards away and he was stopped across from the Dunn residence where the boy was waiting. He gave no explanation for why he did not see the truck earlier. The truck driver saw him. Had he seen the truck earlier, had he extended his semaphores as the law required of him, when he was about to stop, the log truck driver would have been alerted to bring his vehicle to a complete stop before he reached the Dunn house. By all accounts of distances and speeds, even with a one-third loss of braking power, he could have done it.
The trial judge in his reasons for judgment said, "The testimony is unclear as to whether Mr. Cormane made a definite hand motion to the decedent not to cross the road." This finding of fact does not exculpate Cormane. It shows that it was at least as likely as not that he was making a signal for the child not to cross the road. If he was signaling the child not to cross the road when the child was already in the middle of the road, he was negligent.
By his own testimony Cormane did not see the child leave the roadside. His eyes were glued to the log truck. He gave conflicting testimony as to whether he saw the child turn around in the middle of the road and go back. He did not see the child traverse the road toward the bus. He did not know whether he was then giving a hand signal or not. He was not looking at the child, and therefore did not know whether, at that critical time, the child looked up at him. He wanted the child to stay on the side of the road and, if he was giving any hand signal at all, it would have been such a signal. If the child looked up as he neared the bus and saw the hand signal that told him to stay on the side of the road, he would have interpreted that to mean for him to go back. This is as good an explanation as any as to why he turned from a position of safety and ran back into the position of greatest peril. Thus, the entirety of the evidence on this question of fact does not convince us by a preponderance that Cormane did not by his own actions direct the child to turn around and go back.
Moreover, the testimony of the two principal actors, the bus driver and the log truck driver, who were the only witnesses, taken together with the physical facts, suggest that *788 had Cormane seen the log truck when he should have, and put out his semaphores when he was required to, the child would have had ample time to cross the road and get on the bus. Cormane said that when the school bus stopped the log truck was 150 yards away. Gentry testified that when he saw the child begin to cross the road he was 200 yards away. He was traveling at 35-40 miles an hour. Dr. Dart testified that the truck at 40 miles an hour with sound brakes could stop in 107 feet. No one testified what that distance would be considering the loss of one-third of the truck's braking power. Based on the estimates of distances given by both drivers, Gentry should have been able to stop even if his vehicle took two or three times the good-brake stopping distance. Perhaps Gentry did not start braking between 150 and 200 yards away. Perhaps he waited later, too late, to start his braking. These are unanswered questions. What is known, however, is that the child in fact safely crossed the path of the log truck once, and almost twice. It was far enough away to permit him to do that. Had the school bus door been open, and had the child been signalled to come on, he could have safely boarded. The driver's explanation that opening the door would have been interpreted as an invitation to the child to run across the path of the truck is not an exculpatory explanation. The child had been taught to observe hand signals by the driver. The door of the school bus was opposite the bus from the child, and the child could not even have seen it. The testimony is clear that had the child not turned around in the middle of the road and gone back, he could have safely boarded the bus. The driver of this school bus failed to prove he was free of negligence which was a cause-in-fact of the child's death.

FAULT OF GENTRY
Neither of the finders of fact below specifically addressed the fault of Gentry. We will do so.
Gentry admitted he had defective brakes. He knew he had no brakes on the rear axle. He saw the school bus before it stopped at the Dunn residence. Had he started braking then, in all likelihood he could have stopped before he got to the Dunn house even with defective brakes. Familiar with the road, he knew that the Dunn residence had school children. Although the school bus semaphores and red lights were not activated, and Gentry was therefore under no legal duty to stop, he was under a clear duty to keep his truck under control in the presence of children. He did not do it. He was unable to stop until 70 feet past the point of impact. He was at fault and his fault was a cause of the accident.

CONTRIBUTORY NEGLIGENCE OF JAMIE AND/OR HIS PARENTS
There is nothing in the record to suggest any negligence on the part of the parents. Nor is there any evidence of negligence on the part of this six-year-old child. It was argued that Jamie's partial hearing loss in his right ear might have prevented him from hearing Cormane's warning. Cormane never said he was calling out to the child. He said he was making hand gestures.

APPORTIONMENT OF FAULT
Quantifying the fault of each of the drivers, we find that the school bus driver is equally at fault with the truck driver for this tragedy. He was in more control of the situation than the log truck driver. He did not turn on his red lights and extend his semaphores upon stopping, as he was statutorily required to do. Given the distance from the log truck as estimated by the school bus driver at that point in time, 150 yards, by all accounts Gentry could have stopped had he been told to stop in that distance. Gentry obviously did not try to stop until it was too late. Earlier action by Cormane would have created a greater likelihood that Gentry could have stopped before it was too late.
Cormane was also at fault in failing to see Jamie start across the road and in failing to take charge of the situation from then on. Jamie managed to safely cross the path of the log truck and be out of danger. Cormane's failure to keep Jamie in sight, and open the door and motion him to come on, when he was out of peril, was a contributing cause-in-fact of this accident. Indeed, Cormane has failed to convince us that it was not *789 his own hand gesture which caused Jamie, observing it at the last second, to turn back and re-enter the zone of danger.
We attribute 50% of the fault to the bus driver, and 50% of the fault to the log truck driver.

DAMAGES
Mr. and Mrs. Dunn had four children, two adopted and two born to them. Jamie was their youngest biological child. There was testimony they loved him dearly. He had had medical problems. Born with a cleft palate, he had undergone several major operations for its correction. He had a slight hearing loss in the right ear, but not enough for hearing aid correction. There was a considerable age difference between Jamie and the next older sibling. Besides being the youngest, he was their only child at home. He was in the first grade.
We award wrongful death damages to each parent in the amount of $200,000.
Mrs. Dunn heard the impact and she and Jamie's father rushed outside to behold the mutilated body of their son. The scene was so horrible that the school bus driver wisely drove away to avoid exposure of the children on the bus to its view. The reaction of the parents to this grisly discovery is in the record. Their mental anguish or emotional distress was severe, debilitating, and foreseeable. We find that each parent suffered La.Civ.Code art. 2315.6 damages for which we make an award of an additional $50,000.
For the foregoing reasons, the judgment of the trial court is reversed. Judgment is rendered in favor of each parent in the sum of $250,000 (reduced by 50% for the fault of the settling party) against Eric Scott Cormane and the Grant Parish School Board. Judgment is further rendered in favor of the plaintiffs and against the defendants for interest (reduced by 50%) and all costs here and below.
REVERSED AND RENDERED.
NOTES
[1] A motion to stay proceedings as to United Community Insurance Company only, pursuant to an order issued by the Nineteenth Judicial District Court of Louisiana dated March 8, 1995, in the matter "The Honorable James H. `Jim' Brown, Commissioner of Insurance for the State of Louisiana v. United Community Insurance Company," Docket Number 413,956 was filed on the date of argument of this case, and was granted on March 29, 1995.