769 So.2d 112 (2000)
Chris L. CRAIGHEAD, et al., Plaintiffs-Appellees,
v.
PREFERRED RISK MUTUAL INSURANCE CO., et al., Defendants-Appellants.
No. 33,731-CA.
Court of Appeal of Louisiana, Second Circuit.
August 25, 2000.
Rehearing Denied September 21, 2000.
Writ Denied December 15, 2000.
*115 Blackwell, Chambliss, Henry, Caldwell, Cagle, McKee & Camp by Sam O. Henry, III, W. Mark McKee, West Monroe, Counsel for Plaintiffs-Appellees, Chris L. Craighead, Ind. and as W. Admin. of the Estate of Christopher Craighead and Deborah Craighead.
Hayes, Harkey, Smith & Cascio by Harry M. Moffett, IV, Monroe, Counsel for Plaintiff-Appellee, State Farm Ins. Co.
Cook, Yancey, King & Galloway by Sidney E. Cook, Jr., Shreveport, Counsel for Defendants-Appellants, Victor Jerome Sullivan, Cedar Creek School, and Preferred Risk Mutual Ins. Company.
Before BROWN, WILLIAMS and DREW, JJ.
DREW, J.
Victor Jerome Sullivan, Cedar Creek School and its insurer, Preferred Risk Mutual Ins. Co. (Cedar Creek defendants) appealed the judgment in which the trial court (1) granted Motions for Judgment Notwithstanding the Verdict and, alternatively, Motions for a New Trial; (2) found the Cedar Creek defendants to be 80% at fault in causing the accident; and (3) awarded the plaintiffs damages. On March 3, 1997 at 7:20 a.m., Caroline Craighead, age 11, was struck and killed by an eastbound motorist as the child attempted to cross the southern, eastbound lane of Hwy. 80 to board the westbound Cedar Creek school bus stopped in the northern westbound lane of the road. The Cedar Creek defendants complained on appeal that the trial court erred in granting the motions for JNOV and alternative motions for new trial. Additionally, the Cedar Creek defendants objected to being cast with 80% of the fault, with damages for emotional distress and for excessive quantum. For the following reasons, the judgment of the trial court is affirmed.
Prior to filing suit, Caroline's parents and brother (the Craigheads) settled with the driver (Judy Martinez) who struck the child along with Martinez's insurer. The Craigheads sued the bus driver, Sullivan; Cedar Creek; and its insurer, Preferred Risk (No. 33, 731-CA). The Craigheads' UM insurer, State Farm, tendered its limits of $100,000 and filed a subrogation claim against Sullivan, Cedar Creek and Preferred Risk (No. 33,730-CA). The two suits were consolidated for trial and tried before a jury which found no negligence on the parts of the bus driver, the mother and the deceased child. The jury placed 100% of the fault for the accident on Martinez, the driver whose eastbound vehicle struck and killed Caroline. State Farm and the Craigheads filed Motions for Judgment Notwithstanding the Verdict and, alternatively, Motions for New Trial.
*116 On July 26, 1999, the trial court granted the motions and entered a Judgment Notwithstanding the Verdict in favor of the Craigheads. The trial court found that the bus driver, Sullivan, was 80% at fault in causing the accident. The trial court awarded $450,000 to each of the parents and $50,000 each for emotional distress to Mrs. Craighead and her son who witnessed the accident. In addition, the trial court awarded $20,000 for Caroline's survival action. The trial court conditionally granted the Motions for New Trial in the event this court reversed the JNOV. The Cedar Creek defendants appealed.

FACTUAL BACKGROUND AND TESTIMONY
The Craighead family resided in Calhoun, Ouachita Parish, and the children attended Cedar Creek, a private school in Ruston, Louisiana. Each morning, Mr. or Mrs. Craighead drove the children to a pick-up location, the parking lot of the Price Right Pharmacy on Hwy. 80 in Calhoun, for the children to ride the bus to school. On the day of the accident, Mrs. Craighead drove Caroline to the parking lot. They were accompanied by Caroline's nine-year-old brother, Christopher. who was ill and not attending school that day. Highway 80 runs east and west. Mrs. Craighead parked her van south of and perpendicular to Highway 80. The front of the Craighead vehicle was about a van length from the southern, eastbound lane of traffic. When they saw the approaching westbound bus turn on its flashing lights after it had topped the hill, they knew it was Caroline's bus. At trial, Mrs. Craighead estimated that the flashing yellow bus lights came on near the pizza place some distance east of her location. Caroline opened the van door and walked to the road to cross and board the bus stopped in the northern, westbound lane. Mrs. Craighead looked down to put her vehicle in gear to leave. She heard a horn and the impact of the vehicle striking Caroline.
In statements given the day of the accident, Sullivan said that he drove the bus west on Highway 80 and put on his flashing yellow lights as he approached the pick up location. He observed an eastbound gray car which was exceeding the speed limit. Because he feared that the driver would lose control if he put out the stop signs and the red lights, he decided to let that vehicle pass through his yellow flashing lights before putting out the stop signs on the bus. When his bus came to a complete stop in the northern westbound lane, he observed Caroline exit her mother's vehicle and walk into the road. He blew his horn in warning. Caroline stepped back but was struck by the car.
At trial, Sullivan testified that he had been employed at Cedar Creek to drive a bus and do maintenance on the buses for six and a half years at the time of the accident. Sullivan had a Louisiana commercial driver's license. Aside from on-the-job training, he received no formal training to be a school bus driver and had received no instructions on loading and unloading the children or in giving signals to the children.
Sullivan did not recall if the strobe light on top of the bus was on the day of the accident. Sullivan stated he illuminated the yellow flashing lights adjacent to a drive way (about 100 feet from the collision) and acknowledged knowing that state law required that the yellow flashing lights be turned on from 500 to 100 feet from the stop. Sullivan explained that putting on the red lights and putting out the stop signs indicated to the child that the bus and oncoming and following traffic had stopped and that it was safe for the child to cross the road to board. Sullivan agreed that a school bus can be characterized as a "moving red light."
Sullivan saw the eastbound Martinez vehicle which he thought was traveling in excess of the 55 MPH speed limit. Sullivan saw that Martinez did not slow or brake. He decided to let that car pass through the area before putting out the *117 stop signs and illuminating the flashing red lights. Observing Caroline approaching the highway, Sullivan hollered no, but his window was up, he thought. He "laid on his horn" and Caroline paused or stepped back, but was struck by the car. Sullivan summarized the incident by stating that he stopped his bus and Caroline got out, walked to the road, heard the horn, stepped back and was hit by the Martinez car.
In a statement given at the scene of the accident, Martinez said she was traveling east on Highway 80 and saw the bus as her car came beside the store. Martinez saw no flashing yellow lights or stop signs on the bus. She concluded the bus was about to make a right turn. She saw someone at the right front corner of her car and she braked and swerved to try to avoid the pedestrian. Martinez estimated her speed was 50 MPH.
At trial, Martinez testified she had left her child at day care and was driving east to her job when she observed the westbound bus. Martinez said her radio was playing loudly. She braked her vehicle coming down the hill toward what she described as a congested area. The bus appeared to be slowing and she noticed the strobe light on the bus, the only light she observed on the bus. Martinez did not observe the bus completely stopped. Since her child was out of public school on spring break, Martinez did not think the bus was picking up a child. She had the impression the bus was going to turn. She thought she saw Caroline out of the corner of her eye at impact, but also stated she never actually saw Caroline but heard a thump.
State troopers investigating the collision noted that the highway was dry and clear with good visibility in the area. The speed limit was 55 MPH. After being struck, Caroline was thrown 63 feet seven inches and came to rest 16 feet six inches south of the highway in a ditch. Martinez's vehicle traveled 110 feet from the point of impact and her skid marks measured 93 feet, which indicated she hit her brakes after the impact.

REASONS FOR JUDGMENT
In oral reasons for judgment, the trial court quoted La. R.S. 32:80(B)(2):
(2) The driver of any school bus equipped with signal lamps as provided in R.S. 32:318B(4) shall activate the yellow (amber) lights at least one hundred feet, but not more than five hundred feet, before stopping to receive or discharge any pupil, shall deactivate these lamps upon stopping, shall exhibit the red flashing lamps and semaphore sign or signs while stopped, and upon resuming motions shall deactivate both the lamps and the semaphore sign or signs.
The trial court also relied upon Clomon v. Monroe City School Bd., 572 So.2d 571, 577 (La.1990) which stated:
The process by which a child crosses an open highway to board or disembark from a school bus is charged with danger. Accordingly, the legislature has enacted the most stringent provisions feasible to safeguard the entire operation. The child, the bus driver and the motorist are constituents of this process, bound together legally and practically in a special, exigent relationship, from the moment the bus stops and signals until the child is safely across the roadway. If the school bus driver and the motorist perform their duties properly, a child who crosses a typical roadway while leaving or entering an immobile signalized school bus is guarded from harm by a legal cordon during the entire time he is traversing the roadway. He and his parents are entitled to rely for his safe passage upon the motorist's observance of the safety zone and the bus driver's performance of his duty to activate highly visible signals, await the child's safe passage and report any motorist's violation of the legally protected passageway. The injury or death of a child during the protected receiving or discharge procedure can result in severe consequences *118 for even an innocent motorist including criminal prosecution, civil damage suits, and moral opprobrium. (Citations omitted.)
The trial court also relied upon Dunn v. Gentry, 94-1164 (La.App. 3rd Cir.4/5/95), 653 So.2d 783, 786, writ denied, 95-1148 (La.6/16/95), 655 So.2d 335 which held that in Louisiana school buses are considered to be common carriers and as such the driver of a school bus must exercise the "highest degree of care" for school children whose safety is entrusted to him.
[W]here a passenger is not safely transported to his destination the carrier bears the burden of proving its freedom from negligence and must overcome the presumption against it by a preponderance of the evidence.* * *[W]here there is proof of injury to a passenger, the burden shifts to the defendant carrier to show that it was entirely free of negligence contributing to the damage. This shifting of the burden of proof necessarily requires that in order to absolve itself from liability, the defendant must prove not only that the other vehicle which was involved in the accident was at fault, but also that fault was the sole cause of the injury.
In order to grant a new trial, the trial court must consider the evidence without favoring either party and find the jury verdict was clearly contrary to the law and the evidence. The trial court may draw its own credibility determinations and inferences in evaluating the evidence. The trial court must not grant a new trial just because it disagrees with the jury. The verdict is to be set aside only if it is not a fair interpretation of the evidence. In deciding on the motions for new trial, the trial court found that the bus driver violated his statutory duty to activate the red flashing lights and stop signs when stopped in the road. Additionally, the bus driver decided not to turn on the red lights and stop signs because he decided to let the oncoming Martinez vehicle run through first. Sullivan thought that if he turned on the red lights, the driver might panic and lose control of her car. While he was stopped, the bus driver saw Caroline exit the van and approach. Sullivan yelled a warning which she could not hear because the window was up. The bus driver sounded his horn which startled the child who stepped back but was struck and killed.
The trial court found Martinez to be a credible witness who gave consistent testimony. Martinez denied speeding but saw the bus and its strobe. She saw the bus slowing, thought it was turning and wondered why the bus was there, since it was spring break. Martinez saw something out of the corner of her eye just before impact. The trial court concluded that the jury's finding that Sullivan was not negligent was contrary to the law and evidence. The trial court concluded that the new trial motions, sought in the alternative, should be granted. The court observed that had the bus driver complied with his statutory duty to display flashing red lights and stop signs while stopped, the child would be alive today.
Next, considering the motions for Judgment Notwithstanding, the trial court observed that to grant a JNOV, a trial court must consider the evidence in the light most favorable to the parties in whose favor the jury granted judgment (here the bus driver, the school and its insurer) and find that no reasonable jury could have reached the conclusion the jury reached. The bus driver saw a car exceeding the speed limit approaching and decided to let it run through before turning on the red lights and stop signs which the trial court characterized as a moving road block. Although the bus driver was not aware of his statutory duty to turn on the red flashing lights, he is presumed to know the law. The trial court relied upon the jurisprudence that the bus driver's duty is to protect against inadvertent drivers while protecting the child. The bus driver saw the car when it crossed over the hill and could have turned on the yellow lights *119 at 500 feet to alert the driver, but did not do so until closer to 100 feet from the stop. The driver did not illuminate the red lights, reasoning that the speeding car might slam on its brakes and injure the child. However, the bus had time to slow and stop and Caroline had time to get out, walk a van length and one-half to the road, take two steps onto the road and attempt to retreat when she was struck. The trial court concluded that even though a number of options were available to the bus driver, the driver did nothing to prevent the child from leaving her mother's van, walking to the road and entering the roadway.
Viewing the evidence most favorably to the defendants, the trial court found that the plaintiffs showed that the jury's verdict was clearly wrong and the bus driver's violation of a statutory duty was a cause in fact of the harm. Therefore, the trial court overturned the jury's verdict and granted the motions for JNOV. The trial court agreed with the jury's assessment that neither the child nor her mother were negligent.
In assessing the degrees of fault, the trial court observed that it considered the factors set out in Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985)[1] and concluded that Martinez was somewhat negligent in that the yellow lights were illuminated on the bus and she should have been paying more attention. Martinez was assessed with 20% of the fault while the bus driver was found to have been 80% at fault.

DISCUSSION

Judgment Notwithstanding the Verdict
While La. C.C.P. art. 1811 governs the use of Judgment Notwithstanding the Verdict, the article does not set out the grounds on which the trial court may grant a JNOV. In Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La. 1991), the Louisiana Supreme Court set out the criteria. A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the party seeking the JNOV that reasonable men could not reach different conclusions. The JNOV should not be granted merely when there is a preponderance of evidence for the mover. If the opposing evidence is of such quality and weight that reasonable men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. In reviewing a JNOV, the appellate court must determine if the trial court erred in granting the JNOV by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to *120 that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. See also, Moore v. Cabaniss, 29,834 (La.App.2d Cir.9/24/97), 699 So.2d 1143, writ denied, 97-2667 (La.1/9/98), 705 So.2d 1108.
In Daye v. General Motors Corp., 97-1653 (La.9/9/98), 720 So.2d 654, an action arising out of a single vehicle crash, the Louisiana Supreme Court reviewed the jury verdict casting the driver with 75% fault and General Motors with 25% fault, the trial court's JNOV which assessed the driver 25% at fault and General Motors 75% at fault along with the appellate court's judgment which reinstated the jury's award. General Motors's liability was based upon information provided in advertisements about the capabilities of the Antilock Braking System. A negligence case is properly examined under the duty-risk analysis; a negative answer to any of the duty-risk inquiries results in a determination of no liability. The duty-risk analysis is employed on a case by case basis. Plaintiffs must prove that (1) the conduct in question was a cause-in-fact of the harm, (2) the defendants owed a duty of care to the plaintiffs, (3) the requisite duty was breached by the defendants and (4) the risk of harm was within the scope of the protection afforded by the duty breached.
A trial court's findings of fact will not be disturbed unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. Where two reasonable views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Although deference should be accorded to the factfinder, the court of appeal and this court have a constitutional duty to review facts. Therefore, it is improper to assert that a trial court's factual determinations "cannot ever, or hardly ever, be upset."
The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong, but whether the factfinder's conclusion was a reasonable one. (Citations omitted.)
720 So.2d at pp. 658-659.
After reviewing the record, the supreme court concluded the General Motors's advertisements were not a cause of the accident which the court found was caused solely by the negligent driver's excessive speed and improper braking. Daye, supra.
Viewing the evidence in the light most favorable to the Cedar Creek defendants, Sullivan drove the Cedar Creek bus west on Highway 80 in Calhoun and illuminated the yellow flashing lights within the statutorily required distance around 100 feet from his stop. As he approached the pick up site for Caroline, he observed a speeding eastbound vehicle and decided to let the car pass by the bus before he activated the red lights and stop signs. Sullivan feared that the car's driver might panic trying to stop and injure the child if he used the red lights and stop signs. He slowed and stopped the bus in the westbound lane of the highway. Caroline exited her mother's van, walked a van length and one half to the southern edge of the east bound lane. Sullivan screamed a warning but she did not hear him because the window was up. Caroline took two steps onto the road and Sullivan sounded the horn. She appeared startled, stepped back and was hit by the eastbound car which did not brake prior to the impact. Martinez, the driver of the car, was playing her radio loudly. Although she saw the bus slowing and noted a strobe light on the bus, she thought school was out for spring break, thought the bus was about to make a right turn, did not think the bus was picking up and child and did not see the child until an instant before impact.
As a school bus driver and driver of a common carrier, Sullivan had the duty to *121 exercise the highest degree of care to protect Caroline who was entitled to be guarded from harm by a legal cordon during the entire time she was traversing the roadway. Although La. R.S. 32:80(B)(2) mandated that Sullivan exhibit the red flashing lamps and semaphore stop signs while stopped, he did not do so. The bus driver also had a duty to the oncoming motorist. In Clomon, supra, the supreme court stated:
Having examined the provisions of the statute, we conclude that by vesting the bus driver with authority similar to that of a policeman to direct the motorist's use of the highway under pain of criminal penalty the legislature has also imposed upon the bus driver the duty to perform his role properly for the benefit of the motorist. Consequently, the motorist is required and entitled to rely for his safety, convenience and peace of mind upon the bus driver's performance of his duty to activate highly visible signals, await the child's safe passage and remain as a stationary sentinel until the child's security is clearly assured. It is obvious that the bus driver's dereliction may result in minimal to extreme consequences for the motorist including his fright at a near miss, his own physical injury or property damage, or his serious emotional and mental illness associated with a child's injury or death, as in the present case. Moreover, it is evident that the bus driver's duty is owed not only to the careful motorist but also to the inattentive driver who may have relied on the busman's signals or lack thereof. Although the bus driver's duty is not imposed to protect the utterly indifferent or foolhardy, its protection is not restricted to those whose senses are precisely attuned to the prospect of the particular danger encountered. 572 So.2d at pp. 577-578. (Emphasis added.)
The Cedar Creek defendants argued that the trial court based the bus driver's liability on his violation of the statutory mandate to exhibit the red lights and stop signs while stopped and that his failure to do so was not a cause in fact of the harm because Martinez testified she did not see the flashing yellow lights on the bus. That argument is without merit. Martinez clearly saw the bus and stated she saw its strobe (Sullivan and Mrs. Craighead testified the bus's yellow flashing lights were on.). She observed the bus slowing in what she erroneously thought was preparation for a right turn. Had Sullivan illuminated the required red lights and stop signs, Martinez, although somewhat inattentive, would have been alerted that the bus was stopping to load a child and could have taken evasive action. Sullivan's failure to comply with the law was not simply a technical violation but was a cause of this tragedy. Not only did Sullivan owe a duty to the child and Martinez, his breach of that duty was a cause in fact of the harm which resulted. The Cedar Creek defendants did not meet the burden on common carriers of proving Sullivan's freedom from negligence by a preponderance of the evidence. In addition to failing to show that Sullivan was entirely free of negligence, the Cedar Creek defendants did not prove that Martinez was the sole cause of the injury. Dunn, supra.
The Cedar Creek defendants make much of the investigating trooper's testimony that Sullivan was "paying a lot of attention." Undoubtedly Sullivan was sincere in making what he felt were the best decisions under the circumstances, but many of those decisions were wrong and led to Caroline's tragic death. Clearly, Sullivan's actions breached his duty and resulted in the terrible harm that his performance of his duty was designed to avoid. Viewing the evidence most favorably to the Cedar Creek defendants, we find that the trial court correctly concluded that no reasonable jury could have decided that Sullivan's actions were not negligent and not a cause in fact of the accident. The trial court properly granted the motions for JNOV. This conclusion pretermits a discussion of the rulings on *122 the motions for new trial, sought in the alternative.

Apportionment of Fault
Next the Cedar Creek defendants contended that Martinez should have been assessed with most if not all of the fault in the accident and that the trial court erred in finding Sullivan 80% responsible for the damages. Martinez was held 20% responsible. In its very thoughtful and lengthy reasons for entering the JNOV, the trial court relied on the previously noted Watson factors[2] in assigning the percentages of fault and made an specific articulation of its reasons therefor. The bus driver had time to see Martinez's eastbound vehicle coming; to decide the car was speeding; to put on the flashing yellow lights on the bus; to travel 100 feet; to decide there was not time to put out the red lights and stop signs; to slow and stop the bus; to then see Caroline exit her mother's van and walk a van length and a half to the edge of the road; to holler a warning which Caroline did not hear; and to blow the horn as Caroline apparently stepped into the road way. Apparently startled by the horn, Caroline attempted to retreat and was struck and killed. The trial court also noted that Sullivan did not use his horn sooner nor hand signals to communicate with the child or her parent nor the mandated red lights and stop signs to alert Martinez who the court stated was somewhat negligent and should have been paying better attention. The bus driver was in a superior position to the others involved. Had he complied with the law and made better decisions in his efforts to protect Caroline, this horrific tragedy could have been avoided. Even though the trial court did not explain in detail how he applied the Watson factors, we find no manifest error in the trial court's apportioning the fault 80% to Sullivan and 20% to Martinez.

Damages for Emotional Distress
The Cedar Creek defendants' complaints that the damages for emotional distress in favor to Caroline's mother and brother are without merit. It is hard to contemplate a more distressing and disturbing scenario for family members than witnessing their loved one being thrown some 63 feet after sustaining fatal injuries when struck by a vehicle. La. C.C. art. 2315.6 provides that the mother and brother are relatives entitled to recover damages for mental anguish or emotional distress that they suffer as a result of the other person's injury. For a family member to recover for mental anguish or emotional distress, the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable. In Nelson v. Ruston Long-leaf Nurse Care Center, Inc., 32,718 (La. App.2d Cir.2/01/00), 751 So.2d 436, writ denied, XXXX-XXXX (La.4/28/00), 760 So.2d 1175, this court noted that La. C.C. art. 2315.6 codified the standards set out in Lejeune v. Rayne Branch Hospital, 556 So.2d 559, 570 (La.1990) which provided guidelines for those damages: (1) The claimant need not be physically injured or in the zone of danger but must view or come upon the accident soon and before substantial change has occurred in a the victim's condition; (2) The harm must be such that a person in plaintiffs position would reasonably suffer serious metal anguish; (3) The emotional distress must be serious and reasonably foreseeable. Severe emotional distress may be found when a reasonable person would be unable to cope adequately with the mental distress engendered; and (4) There is a direct relationship between the victim and the claimant. The plaintiffs need not present proof of a psychological diagnosis. Nelson, supra.
In addition to noting the horrifying sight witnessed by the victim's mother *123 and brother, the trial court noted their close family relationship and their emotional distress which they suffered in awarding Mrs. Craighead and her son $50,000 each in damages for their emotional distress. The Cedar Creek defendants assert that Mrs. Craighead did not testify she was unable to adequately cope with her daughter's death and there was no proof that either suffered severe emotional distress. Mrs. Craighead did testify that her son called her husband on the car phone and that her husband arrived at the scene very quickly. After her child's death, she sought counseling from the chaplain at the hospital and they also had other individual counseling, counseling as a couple and family counseling to deal with their loss. Mrs. Craighead stated her son had done well, was able to talk about his sister and had handled the situation pretty well. However, they no longer permitted him to ride the bus to school. Mr. Craighead testified his son showed his grief physically through crying and by getting sick. In two years since the accident the only change had been the length of time between the episodes. At the time of trial, Mrs. Craighead still obtained counseling through her pastor. Mrs. Craighead was off work for two weeks and thereafter worked half days with a minimum work load. The shocking scene which Caroline's mother and brother witnessed was certainly one in which persons in the claimants' positions would reasonably suffer serious, severe mental anguish or emotional distress from the experience. The family made commendable efforts by seeking assistance through counseling and by resuming their normal activities to lessen the negative effects of their loss. Although the awards for their emotional distress were generous, the trial court which had an opportunity to assess the damage to the family first hand did not abuse its great discretion under the particular facts of this case.

Quantum of General Damages
Finally, the Cedar Creek defendants urged that the trial court erred in awarding excessive general damages in the amount of $450,000 each to Caroline's mother and father. General damages are those which may not be fixed with pecuniary exactitude. A trier of fact has great discretion in fixing general damages. A trial court's award of general damages should not be overturned by a reviewing court absent an abuse of discretion. When damages are insusceptible of precise measurement, much discretion is left to the trial court for the reasonable assessment of these damages. La. C.C. art. 1999. An appellate court should rarely disturb an award for general damages. Only if an award is first found to be inadequate or excessive on the facts of the particular case may the appellate court refer to the awards in "similar" cases. Greene v. Fox Crossing, Inc., 32-774 (La.App. 2 Cir. 3/1/00), 754 So.2d 339, writ denied, XXXX-XXXX (La.5/26/00), 762 So.2d 1108.
In assessing the awards to Caroline's parents, the trial court noted that this family was one of the closest he had observed from the bench and that the type of person Caroline was resulted from the efforts made by her parents. Pointing out that the loss of their child had changed their lives, the trial court stated that Caroline, an A and B sixth grade student, was an active child in school and dance activities which her parents always attended. Her school work, poetry and photographs placed into evidence vividly illustrated the well-rounded, creative person Caroline was and the closeness of her immediate and extended families. Clearly, the loss of Caroline in this terrible accident was a devastating loss to her family and friends.
A $450,000 award to his mother, a single parent for most of the child's life, was affirmed in In re Medical Review Panel Bilello, 621 So.2d 6 (La.App. 4th Cir.1993), writ denied, 629 So.2d 1139 (La.1993). Following his third open heart surgery, the fourteen year old suffered complications and died after several days *124 during which his mother stayed with him at the hospital. Despite two earlier heart surgeries, the boy led a normal life and had a close relationship with his mother who observed his suffering from the fluid build up around his heart prior to his lapsing into unconsciousness.
In Dartlone v. Louisiana Power and Light Co., 33,597 (La.App.2d Cir.6/21/00), 763 So.2d 779, this court affirmed an award of $350,000 to each parent for the loss of their 17-year-old son and noted a number of other cases containing awards for the loss of a child.[3] The family was extraordinarily close and his death had a devastating effect on his parents both of whom sought therapy and were prescribed medication for depression. Their child had been an outstanding person in every aspect of his life and did everything with his father including hunting, fishing and working on his truck.
In this case, Caroline's father testified that he and the family had therapy including group therapy to handle their grief. The Craigheads no longer permit their son to ride the bus to school. Mr. Craighead identified a book that Caroline's friends and class mates assembled about her and reported the memorial for her by Mr. Craighead's own class at Cedar Creek. He also identified her writings and poetry. He also described her dance activities, family vacations and the loss of her companionship, love and affection. Mrs. Craighead also testified that they religiously attended her activities and about the loss of her daughter's love and affection. As the trial court noted, Caroline had many more meaningful years of closeness, love, affection and togetherness with her family.
While the loss of a child cannot be measured with mathematical certainty, the trial court did not err in awarding $450,000 to each of Caroline's parents.[4]

DECREE
The JNOV granted by the trial court and the awards made therein are affirmed at the costs of the Cedar Creek defendants.
AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, CARAWAY, and DREW, JJ.
Rehearing denied.
NOTES
[1] In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.

In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985).
[2] See footnote 1.
[3] See Gladney v. Sneed, 32,107 (La.App.2d Cir.8/18/99), 742 So.2d 642, writ denied, 1999-2930 (La.1/14/00), 753 So.2d 215 (award of $315,000 to father for wrongful death of 25-year-old daughter was not abuse of discretion); Bryant v. Solomon, 97-2008 (La.App. 4th Cir.3/25/98), 712 So.2d 145 (affirming an award of $300,000 to one parent for the wrongful death of an adult daughter); Owens v. Concordia Electric Cooperative, Inc., 95-1255 (La.App. 3d Cir.6/25/97), 699 So.2d 434, writs denied, 97-2698, 97-2736 (La.1/9/98), 705 So.2d 1113, 1120 (court of appeal reduced trial court's award of damages from $1,000,000 per parent to $350,000 per parent for loss of 16-year-old son); Hasha v. Calcasieu Parish Police Jury, 94-705 (La.App. 3d Cir.2/15/95), 651 So.2d 865, writs denied, 95-0667, 95-0676 (La.4/28/95), 653 So.2d 592, 593 (award of $325,000 per parent for loss of 18-year-old son was not manifestly erroneous); In re Medical Review Panel, Bilello, 621 So.2d 6 (La.App. 4th Cir.1993), writ denied, 629 So.2d 1139 (La.1993) (award of $450,000 to mother for loss of 14-year-old son was not abuse of discretion).
[4] This portion of the opinion reflects the views of the majority of the panel. The writer would have awarded Mr. and Mrs. Craighead $350,000 each. Dartlone, supra.