STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

03-895

VALERIE DUHON DOMINGUE, ET AL.

VERSUS

LAFAYETTE PARISH SCHOOL BOARD

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2001-5116
HONORABLE HERMAN C. CLAUSE, DISTRICT JUDGE
**********

**GLENN B. GREMILLION**
**JUDGE**

**********

Court composed of Ulysses G. Thibodeaux, Chief Judge, Sylvia R. Cooks, Oswald A. Decuir, Glenn B. Gremillion, and John B. Scofield,* Judges.

*Honorable John B. Scofield participated in this decision by appointment of the Supreme Court as Judge Pro Tempore.

**Thibodeaux, C. J., dissents for the reasons assigned by Judge Cooks.**

**Cooks, J., dissents in part for the reasons assigned.**

**REVERSED AND RENDERED.**

**M. Charles Brandt, Jr.**
**111 Mercury Street**
**Lafayette, LA 70503**
**(337) 237-7171**
**Counsel for Secondary Plaintiff/Appellant**
    **Valerie Duhon Domingue**

**Larry Lane Roy**

**Preis, Kraft & Roy**
**P. O. Drawer 94-C**
**Lafayette, LA 70509**
**(337) 237-6062**
**Counsel for Defendant/Appellant**
         **Lafayette Parish School Board**

**Jennifer A. Wells**
**Preis, Kraft, & Roy**
**P.O. Drawer 94-C**
**Lafayette, LA 70509**
**(337) 237-6062**
**Counsel for Defendant/Appellant**
         **Lafayette Parish School Board**

**Brian T. Roy**
**Preis, Kraft & Roy**
**P. O. Drawer 94-C**
**Lafayette, LA 70509**
**(337) 237-6062**
**Counsel for Defendant/Appellant**
         **Lafayette Parish School Board**

GREMILLION, Judge.

The plaintiff, Valerie Duhon Domingue Baranco, tutrix of Benjamin Domingue, appeals the trial court's judgment finding Domingue 90% at fault in causing the injuries he sustained after he was hit by a vehicle. The defendant, the Lafayette Parish School Board (School Board), appeals the trial court's judgment finding it 10% at fault in causing the accident. For the following reasons, we reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

On October 30, 2000, Domingue, who was then eleven years old, decided to walk home from Acadian Middle School (AMS) with his friend, Cortez Siner, rather than ride the bus as he was instructed to do so by his mother. Domingue and Siner exited the rear of the school, where other students, who live in the neighborhood immediately behind the school, exit to walk home. En route to their neighborhood, which was slightly more than a mile from the school, Domingue ran out into Moss Street, a busy four-lane highway, and was struck by a truck driven by Joseph LeBlanc. Domingue sustained serious injuries requiring several surgeries and months of physical therapy.

Baranco filed suit in October 2001, urging that the School Board breached its duty to properly supervise her son, failed to have any checks in place to assure that children who are supposed to ride the bus do so, failed to have a formal written policy or plan regarding the return of the children to their homes, and specifically, failed in assuring that Domingue rode the school bus home, but arrived there via the school bus. Trial commenced in October 2002. At the conclusion of the trial, the trial court found that the School Board was 10% at fault while Domingue was comparatively, 90% at fault. The trial court made the following awards:

1

| | |
|---|---|
| General Damages | $200,000 |
| Special Damages | $59,052.13 |
| Future Medical Expenses | $20,000 |
| Subtotal | $279,052.13 |
| Minus 90% Comparative Fault | -$251,146.92 |
| Total | $27,905.21 |

The trial court issued a judgment on December 19, 2002, ordering that Baranco, on behalf of Domingue, be paid $27.905.21, plus legal interest. Both parties timely appealed to this court.

## ISSUES

Baranco claims the trial court erred in assessing Domingue with 90% of the fault. The School Board claims the trial court erred in 1) imposing a duty on it which is not grounded in statutory or jurisprudential law; 2) in finding that its failure to have a particular procedure in place was a cause-in-fact of Domingue's injuries; 3) in awarding future medical damages in the complete absence of any evidence supporting such an award; 4) in awarding excessive general damages; and 5) in taxing it with all court costs and expert expenses when it allocated only 10% of the fault to the School Board.

## LIABILITY

The Louisiana Supreme Court recently summarized the law pertaining to negligence actions in *Lazard v. Foti*, 02-2888, pp. 3-4 (La. 10/21/03), 859 So.2d 656, 659:

> This court has adopted a duty-risk analysis to determine whether liability exists under the particular facts presented. *Syrie v. Schilhab*, 96-

1027 (La.5/20/97), 693 So.2d 1173, 1176. Under this analysis, the plaintiff must prove that the conduct in question was the cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached. *Posecai v. Wal-Mart Stores, Inc.*, 1999-1222 (La.11/30/99), 752 So.2d 762, 765. Under the duty-risk analysis, all four inquiries must be affirmatively answered for the plaintiff to recover. *Id.*

. . . .

A threshold issue in any negligence action is whether the defendant owed the plaintiff a duty. *Meany v. Meany,* 94-0251, p. 6 (La.7/5/94), 639 So.2d 229, 233. Whether a duty is owed is a question of law. *Peterson v. Gibraltar Sav. & Loan,* 98-1601 98-1609, p. 7 (La.5/18/99), 733 So.2d 1198, 1204. The inquiry is whether the plaintiff has any law, statutory or jurisprudential, to support his claim. *Roberts V. Benoit,* 605 So.2d 1032, 1043 (La. 1991)(affirmed on rehearing).

The School Board urges that the trial court committed legal error in imposing a duty on it more stringent than that required by law citing *Wallmuth v. Rapides Parish School Board*, 01-1779 (La. 4/30/02), 813 So.2d 341, in which the supreme court faced the issue of one student injuring another. Although *Wallmuth* adopted the standard of liability applicable to the school board for the actions of its students under La.Civ.Code art. 2320, we find this same standard applicable to a school board's overall duty to supervise its students.

A school board, through its agents and teachers, owes a duty of reasonable supervision over students. La.Civ.Code art. 2320; *Adams v. Caddo Parish School Bd.,* 25,370 (La.App. 2 Cir. 1/19/94), 631 So.2d 70, *writ denied*, 94-684 (La.4/29/940), 637 So.2d 466. The supervision required is reasonable, competent supervision appropriate to the age of the children and the attendant circumstances. *Jackson v. Colvin*, 98-182 (La.App. 3 Cir. 12/23/98); 732 So.2d 530*, writ denied,* 99- 228 (La.3/19/99), 740 So.2d 117. This duty does not make the school board the insurer of the safety of the children. *Id.* Constant supervision of all students is not possible nor required for educators to discharge their duty to provide adequate supervision. *Adams,* 631 So.2d 70.

Before liability can be imposed upon a school board for failure to

3

adequately supervise the safety of students, there must be proof of negligence in providing supervision and also proof of a causal connection between the lack of supervision and the accident. *Id.* . . . . Furthermore, before a school board can be found to have breached the duty to adequately supervise the safety of students, the risk of unreasonable injury must be foreseeable, constructively or actually known, and preventable if a requisite degree of supervision had been exercised. *Id.*

*Id.* at 346.

Siner, who was twelve years old at the time of the accident, testified that he had been kicked off the bus and was walking home. He said that Domingue was about to get on the bus, but he asked him to walk home with him instead. He stated that his parents did not know he had been kicked off of the bus and that he did not have permission from his parents to walk home that day. Siner stated that he and Domingue walked down Moss Street and attempted to cross the street when the accident occurred. He testified that the truck driven by Leblanc swerved and hit Domingue. He further testified that Domingue had walked home a few times before, however, he did not know Domingue got in trouble for doing so. Siner testified that he did not know why he and Domingue did not use the crossing guard to cross Moss Street. He further stated that he knew Moss Street was very busy. He also testified that, if he and Domingue had crossed by way of the crossing guard to get onto the other side of Moss Street, they would not have had to cross the street again to get home. Siner testified that he chose the route they would take to get home and that he had walked this route to get home from school once before. He said that there was one teacher on duty in the area where he and Domingue exited the school.

Melaine Doty, Baranco's friend and neighbor, testified that her son, who

4

was eleven at the time, also attended AMS. She testified that she was under the impression that someone from the school made sure her son got on the bus. She also testified that she filled out a form at the beginning of the school year indicating whether her child was a car-rider, a walker, or a bus-rider, and if so, what number bus they were supposed to be on.

Scott Segura, the School Board's transportation supervisor, testified that he has been with the transportation department for ten years. He stated that regular education bus drivers have no duty to make sure that any child rides the bus in the morning or afternoon. He stated that, at the beginning of the school year, each bus driver is given a list of kids who are supposed to be riding his bus. Segura testified that, although there are teachers on bus duty, a child who says "I am walking home today," would not be stopped from doing so and that there is no measure in place to prevent a child from deciding unilaterally to walk home without advising anyone. He stated that the actual amount of riders per day varies greatly due to illness, after school activities, and other circumstances. Segura said that there is no way of knowing whether an individual child will be on the bus due to all of these particular circumstances. He stated that it would be impossible, logistically and financially, to keep track of all of the students in all schools to determine if they were going to ride on the bus or not. He further testified that the department of transportation's responsibility only begins once the child actually gets on the bus and not before then. Segura stated that approximately 22,000 kids ride the bus at some time or another in the Lafayette Parish school district. Segura was questioned as to why there is not anything in the handbook they send out to parents at the beginning of the school year

5

stating there is no plan or program to ensure that every child gets on the bus. He replied that it is understood that the parent's have a responsibility to determine whether the kids get on the bus.

Lawrence Dupre, the former principal of AMS at the time of the accident, testified that, at the time, school enrollment was around 660 to 700 students. He estimated that around thirty to forty students walked home from AMS and that around one hundred students were car-riders. Dupre stated that the policy in place at the time of accident was that students reported to either 1) the bus loading area, 2) the car-rider area, or 3) to the area where the walkers leave the campus. He stated that teachers supervised the students from the classroom to one of those locations and that they were responsible for making sure the students got to the location without delay. Dupre testified that there was no roll call or anything to make sure that the bus riders actually got on the bus. He stated that the primary function of the teachers on duty was disciplinary—to make sure that the students did not run or go between buses, that they went to the area that they were supposed to go to, and that they loaded the bus in a safe and orderly manner.

Dupre went on to describe how students are tracked throughout the day for attendance purposes, but that, once school is let out at 3:35 p.m., students are expected to go to their correct designation. He stated it was the student's decision whether to walk home or board the bus. However, he stated that the school does compile a list of the parent's wishes with regard to whether their child is to be a walker, bus-rider, or car-rider. He stated that it is the student's responsibility to comply with his parent's wishes and that AMS did not do anything to implement the

6

parent's particular wishes. However, he did state that, once a child gets on the bus, certain rules apply regarding where the child can be dropped off. Dupre testified that, basically, the school relies on ten-to-twelve-year-olds to go where they are expected to once school lets out. Dupre further testified that he has been the principal of three other schools over the course of fourteen years and that the manner in which the students were dismissed at AMS was the same at all of the other schools.

Dupre further testified that, at the beginning of the school year, an orientation is conducted with the students and they are shown where to go if they are walkers, bus-riders or car-riders. Dupre was asked whether a color-coded name tag could identify whether the student was a bus-rider, car-rider, or walker. He responded that it would be a means of identifying the student's transportation method, but that it would be impractical to implement because a student's status often changes throughout the day and week depending on extra-curricular school activities, illness, and other circumstances. Dupre stated that the method that was in place at AMS resulted in very few problems. He testified that most of the problems were due to either the student lingering to talk and missing the bus or to a teacher keeping the students after class which caused them to miss the bus. He testified that "overwhelmingly the students really knew what their responsibilities were and carried them out."

Dupre testified that, if a parent made a special request because of a child's special needs or for other reasons, the school would make every effort to assist in meeting those needs. He testified there was no prior request by Baranco requesting that the school ensure that Domingue get on the bus.

7

Shirley Sampy, the assistant principal at AMS at the time of the accident, also testified that there was no procedure in place to ensure that bus-riders get on the bus, except that each student knows it is their responsibility. Sampy also testified that Baranco did not notify them that Domingue was not to walk home until after the accident. She also testified that requiring the bus driver's to do some sort of roll-call was not a practical solution because it would be too time consuming. Sampy further testified that, while roll call sheets are mandated by State law in the classrooms, there is no such requirement pertaining to the bus. She also testified as to the difficulties that would be encountered if the bus drivers instituted some sort of tag system. She stated that, if the bus driver were to find that he was missing some students, it would be nearly impossible to locate them because the bus driver is not allowed to get off the bus once students have loaded. Thus, he would have to call for a teacher to come over and go search for the missing students while he sat with a bus full of kids waiting to depart.

Domingue testified that, at the time of the accident, he weighed seventy-four pounds and was in the sixth grade. He testified that he had walked home from school twice, without telling anyone, when he was in fifth grade. He stated that, on the day of the accident, he had planned to get on the bus, and was stepping onto it, when Siner asked him if he wanted to walk home. Domingue testified that he and Siner began to cross Moss Street in the middle of the street, rather than at a light. The next thing he remembers is being transported by ambulance to Lafayette General and then to Children's Hospital in New Orleans, where he underwent surgery on his hip and elbow.

Domingue testified that he was a bus-rider and that his mother did not allow him to walk home. He testified that his mother had caught him the two times he walked home when he was in the fifth grade, fussed at him, told him how dangerous it is to walk home from school, and punished him. He stated that he understood that he was prohibited from walking home and the reasons why. However, Domingue testified that, when he was walking home with Siner and crossing the busy Moss Street, it never occurred to him that it was dangerous. He further testified that he was not allowed to go to Winn Dixie or Burger King because he would have to cross Moss Street. He also testified that, on the day of the accident, he knew he was supposed to take the bus home and that his mother's instructions were that he take the bus. Domingue stated that he chose to walk instead. He testified that he still runs and plays baseball, basketball, and football, skateboards, and rides his bicycle. He testified that he passed the sixth grade and was home-schooled from the time of the accident until February or March of the following year, when he returned to school.

Baranco testified that, on the day of the accident, she thought Domingue would be on the school bus because that was what he was supposed to do and that was what she had instructed him to do. She testified regarding the incidents when Domingue was in the fifth grade and walked home. She stated that, the first time, he did not arrive home when he was supposed to and that she called the school and told them that Domingue did not get off the bus and could they page him. She stated that the lady who answered the phone paged for Domingue, but that he did not answer. She testified that she got into her truck and went out to look for him and found him and two other boys walking home from school. She claims that she called the school

9

back wanting to know why he had walked home when he was supposed to be on the school bus. However, Baranco stated that the school did not respond to her inquiry. She went on to testify that Domingue was punished and that she explained to him why he should not walk home. However, she testified that he did it again in the fifth grade and that she called the school and went out looking for him. She stated that the school gave no explanation. Baranco also stated that Domingue was punished again. Baranco testified that she spoke to Dupre and told him that she was concerned about Domingue walking home. She only remembers that Dupre did not have an answer as to why Domingue walked home.

Baranco further testified that the form sent out at the beginning of the year to determine if a child was a bus-rider, walker, or car-rider is what gave her the impression that someone made sure her child was put on the bus. She testified that, in October 2000, Domingue was not mature enough to walk home because he was forgetful, did not follow directions well, and engaged in immature activities. She stated that she had to explain things to him several times before he would understand.

After reviewing the standard applied to the School Board, we find that the duty imposed by the trial court went above and beyond that which is required by law. The trial court opined that a procedure to distinguish walkers from non-walkers may have acted as a deterrent. We find this reasoning unpersuasive in imposing such a duty on the School Board. Assuming that such procedures were in place, there is nothing that would prevent a "designated walker," who had been authorized by school personnel to exit the school as a "designated walker" in the same manner as Domingue and Siner, from running across a highway and being injured. We do not feel that any

10

of the suggested measures would have changed the outcome. Moreover, punishment and reprimand by his own mother did not deter Domingue from doing that which he knew he was not supposed to. We are certain that anything short of an impossible system, that would require a roll-call of every student exiting the school, taking into account students who may have left school earlier in the day and who are involved in an ever-changing series of after-school events, would have been an effective deterrent. Furthermore, it is not unreasonable to expect children in the junior high age range to follow their parent's directions. It is clear from Domingue's own testimony that he knew he was not supposed to walk home from school, he knew that Moss Street was dangerous, and he decided to do it anyway.

We also find that the form sent out at the beginning of the school year did not give parents the false impression that the School Board would ensure that its students used the checked method to return home following the end of the school day. Moreover, any reliance Baranco claims on the form is misled. She clearly should have been aware, based on the fact that Domingue had walked home two times in the fifth grade, that the form was not a guarantee that her son would arrive home by school bus.

Baranco points us to several cases, however, we find that none of them actually support her position. In *Nash v. Rapides Parish School Board,* 188 So.2d 508 (La. 3 Cir. 1966), the plaintiff urged that the defendant failed to adequately supervise the students after school had let out which led to another student poking the plaintiff in the eye with a stick. This court found that, although the school board has a duty to supervise its students while they await the school bus, accidents such as this one

11

"happen so quickly that unless there was direct supervision of every child (which we recognize as being impossible), the accident can be said to be almost impossible to prevent." *Id.* at 510. Similarly, while we recognize that the School Board has a duty to supervise students while they are leaving school, it is almost impossible to provide supervision in a situation such as the case at hand.

In *Sutton v. Duplessis,* 584 So.2d 362 (La. App. 4 Cir. 1991), six-year-old Peter missed the school bus, was sent to the office, and told to wait until his mother could pick him up from school. However, he saw a friend in the hallway and walked home with him. Upon arriving at the friend's house, the friend's mother instructed Peter to return to school as his mother would be waiting for him. The six-year-old darted into the street and ran into a vehicle. The trial court found Peter's mother 60% at fault for failing to pick him. We reversed and found the school board 100% at fault stating that, "the School must have a policy to insure that younger students, such as Peter, are properly supervised and do not leave the school unattended." *Id.* at 365. We reached the same result in *Gary v. Meche,* 626 So.2d 901 (La.App. 3 Cir. 1993), in which another six-year old was injured when she ran into the street and collided with a pickup truck. We find these circumstances easily distinguishable from the one at hand. As noted in *Wallmuth*, 813 So.2d at 346, the school board's duty is to provide "competent supervision *appropriate to the ages of the children* and the attendant circumstances." The level of supervision required for six-year-olds versus eleven and twelve-year-olds cannot be compared. The current policy of AMS, to ensure that its students are aware of their responsibilities, including where to report to once school has been dismissed, is sufficient.

12

We find the school board did not breach its duty to Domingue, that is to ensure the orderly and non-violent flow of children to the appropriate area of departure. Accordingly, we reverse the trial court's finding that the School Board was at fault and find Domingue100% at fault in causing the accident.

**GENERAL AND SPECIAL DAMAGES**

As we have found the School Board bears no liability, these issues are rendered moot.

**COURT COSTS**

Finally, the School Board urges that the trial court abused its discretion in allocating all of the court costs and expert expenses to them. Based on our finding that the School Board is 0% at fault we reverse the trial court's allocation of these costs and expenses and allocate them 100% to Domingue.

**CONCLUSION**

The trial court's judgment finding the defendant-appellant, the Lafayette Parish School Board, 10% at fault and assessing it with 100% of the costs is hereby reversed. All costs of this appeal are assessed to the plaintiff-appellant, Valerie Duhon Domingue Baranco, tutrix of Benjamin Domingue.

**REVERSED AND RENDERED.**

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

03-895

VALERIE DUHON DOMINGUE, ET AL.

VERSUS

LAFAYETTE PARISH SCHOOL BOARD

**COOKS, J**., **dissents in part**.

I respectfully disagree with the majority opinion reversing the trial court and absolving the School Board of any responsibility in causing the injuries suffered by Benjamin. At the very least, I would assess some percentage of fault to the School Board for this accident. The majority opinion allows this school to completely abdicate its responsibility for student safety once the dismissal bell rings. This view is contrary to principles established in prior jurisprudence holding school boards liable for failing to establish procedures for the safety of students in its legal custody. Imposing some degree of fault to the school board would require this school, and others similarly situated, to implement procedures for the safe dismissal of students. Simple measures, such as posting duty teachers at points of entry to and exit from campus and requiring students to wear color-coded identification tags, might have prevented this accident. These measures are not so onerous a burden to the school considering the risk of injury to a student at dismissal time. In my opinion, the majority opinion sets a dangerous precedent for school administrators seeking direction from the judiciary regarding their potential liability at dismissal time.

*Custody and Duty of Supervision*

It is a well established rule a school board has the duty of "reasonable competent supervision" for the safety of the children within its legal custody. *Jackson v. Colvin*, 98-182 (La.App. 3 Cir. 12/23/98), 732 So.2d 530, 533. This court has recognized the "liability of the school board and its employees for injuries to students exists only when the school board has actual custody of the students entrusted to their care." *Id.* The first inquiry in this case is whether the school board had legal custody of Benjamin at dismissal time. The majority wrongly concludes there was a break in custody after the dismissal bell rang. The majority relies on the testimony of the principal of Acadian Middle School (AMS) to find "it is the student's responsibility to comply with his parent's wishes and . . . AMS did not do anything to implement the parent's particular wishes." The assistant principal testified "there was no procedure in place to ensure that bus-riders get on the bus, except that each student knows it is their responsibility." The School Board's transportation supervisor testified "the department of transportation's responsibility only begins once the child actually gets on the bus and not before then." He further testified, "it is understood that the parents' have a responsibility to determine whether the kids get on the bus." This testimony led the majority to conclude once the dismissal bell rings the children are on their own. The school board no longer has a duty to supervise bus riding students or establish procedures to ensure their safety. I am sure this is news to parents of bus riders, all of whom rely upon the school to see that their children arrive home safely. The majority opinion is contrary to jurisprudence, some from this circuit.

Legal custody and its attendant duty for student safety is "generally always present when a child is on campus during regular school hours." *Jackson v. Colvin*, 98-182 (La.App. 3 Cir. 12/23/98), 732 So.2d 530, 533. Additionally, the responsibility for supervising students has been extended to children on school sponsored field trips,

participating in school sponsored extra-curricular activities on school grounds and waiting on school property for the school bus. *See Jackson v. Colvin*, 98-182 (La.App. 3 Cir. 12/23/98), 732 So.2d 530. Generally, in the case of car riders and walkers, responsibility for the child ends once they leave campus. However, "there are times, nevertheless, when school boards, although not responsible for the entire walking route of students to and from school, have voluntarily assumed a duty to provide crossing guards at certain places." *Id.* at 533. In these cases, the school board must ensure the guard is on duty at the designated time. *See Barnes v. Bott*, 615 so.2d 1337 (La.App. 4 Cir.), *writ denied*, 619 So.2d 546 (La. 1993). The situation is different when the child is a bus rider. In these cases, school board custody, and the duty of competent supervision, *extends beyond the dismissal bell until the child arrives home*. This court has recognized a continuing "custodial relationship" which does not end until that child arrives home safely. In *Jackson*, this court has stated:

> When the school board provides bus transportation for the student, the duty of care and supervision extends temporally and spatially throughout this custodial relationship.

*Jackson* at 533.

In *Jackson*, the student customarily walked home from school and was stuck by a car on her way home. In absolving the school board of any liability, this court discussed the legal custody of the school board to bus riders and to students who walk home. The court stated:

> Unless the school board provides transportation for a child there is no custodial relationship and therefore no duty of supervision to and from school. La.R.S. 17:158 authorizes a school board to provide free transportation for students residing more than one mile from the school they attend. School boards are not authorized to provide transportation for students residing within one mile their school. Santana resided within one mile of her school. A school board in these circumstances is not responsible for students who walk to and from school.

*Jackson* at 732 So.2d 534.

3

The court in *Jackson* cited another case from this court, *Dunn v. Gentry*, 94-1164 (La.App. 3 Cir. 4/5/95), 653 So.2d 783, *writ denied*, 95-1148 (La. 6/16/95), 655 So.2d 335, where both the bus driver and the motorist were held responsible for the death of a student hit by a logging truck when attempting to cross the street. The court found if a child is bus rider, the responsibility for the child's safety is unbroken until the child reaches home safely. This court, quoting the Louisiana Supreme Court in *Clomon v. Monroe City School Bd.*, 572 So.2d 571 (La. 1990), stated:

> The child, the bus driver, and the motorist are constituents of this process, bound together legally and practically in a special, exigent relationship, from the moment the bus stops and signals until the child is safely across the roadway.

*Dunn* at 786.

It is clear from the *Jackson* and *Dunn* case since Benjamin was a bus rider, the school board's custodian relationship was unbroken and remained from the time he entered the school yard until the time the school bus was scheduled to drop him off at home. This duty, minimally, required the School Board to establish procedures to ensure bus riders board and remain on the bus.

*Procedure for the Safe Dismissal of Students*

It is undisputed Acadian Middle School had no procedure in place to ensure students reported to their designated areas. Both the principal and assistant principal testified to this fact. The majority concludes supervision of students during dismissal would be "almost impossible." I disagree. Duty teachers posted at points of entry to and exit from campus along with color-coded identification tags would provide one method to track students after the dismissal bell. This is part of the school's responsibility. The absence of adequate procedures for supervising students at Acadian Middle School was amply demonstrated at trial during the testimony of the assistant principal, Ms. Sampy. Another student, Cortez Siner, was designated as a

4

bus rider. He was suspended from riding the bus for three days because of disciplinary problems. Ms. Sampy testified she never notified Cortez's mother that he was not riding the bus or that he was walking home. The following exchange occurred between Ms. Sampy and the trial court:

THE COURT: And he was suspended – Was it a two (2) day –
THE WITNESS: It probably was a three (3) day suspension.
THE COURT: Okay. And so a form would have been generated, or a phone call, to Cortez's parents?
THE WITNESS: Yes.
THE COURT: But at least –
THE WITNESS: It would have been attempted.
THE COURT: If I'm to believe the testimony, that didn't happen as to him. At least it sounded like the parents did not know that he had been – Cortez had been suspended.
THE WITNESS: It was attempted to call the parents, but for some reason I didn't get in touch with the mother or father.
THE COURT: So it was unsuccessful.
THE WITNESS: Yes. So Cortez was given a copy of the form to take home to his parents.
 . . .
THE WITNESS: Apparently, I didn't get in touch with the parents the first time, and *I trusted Cortez to give the paper to his parents, which, of course, as a child he didn't do that.*

I would find the School Board breached the duty of reasonable supervision by failing to establish procedures for the safe dismissal of students. The majority cites *Sutton v. Duplessis*, 584 So.2d 362 (La.App. 4 Cir. 1991) and *Gary v. Meche*, 626 So.2d 901 (La.App. 3 Cir. 1993), both of which hold the school board liable. However, the majority seeks to distinguish these cases from the present one. In so doing, the majority ignores the legal principles upon which these cases are based. Principles which are applicable to the case at hand.

In *Sutton*, the mother of a six-year old student failed to pick him up from school on time. The child was waiting in the principal's office. He was told not to leave the office. However, he wandered off campus and was hit by an automobile. This court found the risk of injury foreseeable and the school board liable for failing to provide

5

procedures to guard against this situation. The court stated:

> The possibility that parents occasionally will not show up on time to get their children at dismissal, whether it be early dismissal or a regular one, is certainly foreseeable by school authorities. Therefore, the school must have a policy to insure that younger students, such as Peter, are properly supervised and do not leave the school unattended.
> . . .
> As the trial judge stated: "It is apparent that the School Board had no procedures to care for those students like Peter whose parents had failed to pick them up early on the day of report card conferences." In this case, reasonable supervision would require at the very least a teacher or other adult assigned specifically to watch these students.

*Sutton* at 365-66.

In *Gary*, the trial court found there was no duty on the part of the school to reasonably supervise students after school hours, this court reversed, stating:

> Concerning the actions or inactions of the School Board and the Town of Welch, the record reveals that the elementary school had no supervision policy for its students once classes were dismissed . . . . In reaching these conclusions, the trial judge failed to consider the well-established principle in this state that a school board has the duty to provide reasonable care commensurate with the risks incurred by the children in its custody. . . .Both *Barnes* and *Sutton* reiterated a school board's duty to reasonably supervise young students. Neither restricted this duty to school hours. (*See also Johnson, supra*, 353 So.2d 1114.) In *Barnes*, the school board was found to have breached this duty by failing to adopt procedures which would either insure the crossing guards's presence or provide an alternative plan for assisting the children in crossing the street. In *Sutton*, the school board was found to have breached its duty by failing to insure that young children do not leave school unattended.

*Id.* at 903-904.

The *Gary* court rejected the trial court's finding that "it is the responsibility of the parents to see that their children arrive home safely." *Id.* at 903. The court found the school board "had the authority to supervise and that certain supervisory measures were feasible." *Id*. at 904.

In *Jackson v. Colvin, supra*, this court, discussing the holding in Gary, found once the school board assumes the "custodial relationship" for a child, it must establish procedures to provide for adequate supervision. The court stated:

6

The facts in Gary, 626 So.2d 901, present another example where the transition from school board custody to parental custody had not taken place. . . In imposing liability on the school board, the court found that the school board failed to present any evidence of a supervision policy once classes were dismissed. There was no one on duty in the school yard at dismissal, a critical time to ensure that students safely reached their busses or their parents' vehicles. Although the child was off-campus, the accident occurred immediately following and as a result of the child's unsupervised departure from school grounds.

*Jackson* at 534.

In this case, as in *Gary* "supervisory measures were feasible." The school had no policy in place to insure students would not just walk off campus unattended. Benjamin's mother assumed her child would be riding the bus home. The parents were required to designate in writing whether their child would be a car rider, bus rider or walker. Parents of bus riding students assume the children will be under the supervision of school board personnel until they arrive home after school. By undertaking to provide transportation to Benjamin, the school board assumed this responsibility but failed to provide adequate supervision after school hours. A similar situation occurred in *Barnes v. Bott,* 571 So.2d 183 (La.App. 4 Cir. 1991), when a child was injured when attempting to cross street. The school hired a crossing guard. However, on the day of the accident the crossing guard was absent due to illness but failed to notify the school. The court found the school board liable, stating:

By participating in and accepting the benefits of the program, we find that the School Board voluntarily assumed the duty of verifying that the crossing guard would be present at designated intersections during her normal duty hours. . . .[N]o procedure was established by the school which would timely alert them to the absence of the guard in order to insure that the intersection was supervised or that the students or their parents were aware of the absence. The School Board cannot absolve itself of responsibility by asserting that the principal was never instructed by the City to provide a substitute in the case of absence. ... We find that the School Board breached its duty to its students by failing to adopt and implement a procedure which would require a designated school board employee to verify the presence of a school crossing guard and to provide for alternative personnel or a timely warning in the event of the guard's absence.

7

*Id.* at 186.

In this case, by providing bus transportation to students and requiring parents to designate in writing whether they wished to use the buses, the school board assumed the duty of establishing procedures to insure bus riders arrived home safely. At the very least, the school should have a procedure for insuring students arrive at their correct destination on campus and leave campus in accordance with the wishes of the parent.

*Accident was Foreseeable and Procedures were Available*

The majority incorrectly concludes the accident was unforeseeable and there were no feasible alternatives to having no system in place at dismissal. The majority states:

> We are certain that anything short of an impossible system, that would require a roll-call of every student exiting the school, taking into account students who may have left school earlier in the day and who are involved in an ever-changing series of after-school events, would have been an effective deterrent. Furthermore, it is not unreasonable to expect children in the junior high age range to follow their parent's directive.

I do not find it is unreasonable to expect a school to keep track of its students at dismissal time regardless of an "ever-changing series of after-school events." Acadian Middle School did not even try to fulfil their responsibility of supervision. Acadian Middle School in Lafayette is located on Moss Street, a busy four-lane roadway. School enrollment is between 660 and 700 students. Once the school bell rings there are three designated areas for the safe dismissal from campus, the car-rider area, the bus loading area and the area where walkers leave campus. Because Acadian Middle School is located on a busy highway, students who will walk home, cannot be dismissed except in a designated area. The school recognized the danger on Moss Street and employed a crossing guard for children walking home from school. However, regardless of the danger, the principal, Mr. Dupre, testified Acadian Middle

8

School has no procedure in place to see that students arrive at the correct designated area or leave campus by the correct mode of transportation. This fact alone is enough to find the School Board breached its responsibility to insure the safety of its students at dismissal time. Moreover, in this case, parents were lead to believe there was a procedure in place. Parents were required to designate in writing how their children would be transported home. Once the school undertook the responsibility and gave parents a reasonable expectation of their child's safe dismissal, they should have followed through with adequate procedures. Benjamin was only eleven years old. His home was three miles from campus. He was designated by his mother as a bus rider. His mother had previously voiced her concerns over her son walking home from school to school personnel. Mr. Dupre testified he has been a principal for fourteen years. As an experienced principal he should be well aware of the fact that an eleven year old boy will disobey his parents and exercise poor judgment especially when in the company of an older child. The accident which occurred, being hit by a car, is also foreseeable, considering the danger on Moss Street. As previously stated, simple measures, such as posting duty teachers at points of entry to and exit from campus and requiring students to wear color-coded identification tags, might have prevented this accident. These measures are not so onerous a burden to the school considering the risk of injury to a student at dismissal time. I would find the School Board partly at fault in causing this accident.